**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FELLOWSHIP OF CHRISTIAN
ATHLETES, an Oklahoma
corporation; FELLOWSHIP OF
CHRISTIAN ATHLETES OF PIONEER
HIGH SCHOOL, an unincorporated
association; CHARLOTTE KLARKE;
ELIZABETH SINCLAIR,
                *Plaintiffs-Appellants*,

v.

SAN JOSE UNIFIED SCHOOL DISTRICT
BOARD OF EDUCATION; NANCY
ALBARRAN, in her official and
personal capacity; HERB ESPIRITU, in
his official and personal capacity;
PETER GLASSER, in his official and
personal capacity; STEPHEN
MCMAHON, in his official and
personal capacity,
                *Defendants-Appellees*.

No. 22-15827

D.C. No.
4:20-cv-02798-
HSG

OPINION

Appeal from the United States District Court
for the Northern District of California
Haywood S. Gilliam, Jr., District Judge, Presiding

Argued and Submitted August 9, 2022
Seattle, Washington

Filed August 29, 2022

Before:  Morgan Christen, Kenneth K. Lee, and
Danielle J. Forrest, Circuit Judges.

Opinion by Judge Lee;
Concurrence by Judge Lee;
Dissent by Judge Christen

## SUMMARY[*]

### Civil Rights

The panel reversed the district court's denial of a motion for a preliminary injunction sought by a derecognized student club, the Fellowship of Christian Athletes, and directed the district court to enter an order reinstating the Fellowship as a student club within the San Jose Unified School District.

The Fellowship of Christian Athletes ("FCA") requires students serving in leadership roles to abide by a Statement of Faith, which includes the belief that sexual relations should be limited within the context of a marriage between a man and a woman.  The San Jose Unified School District (the "School District") revoked FCA's status as an official student club at its high schools, claiming that FCA's religious pledge requirement violated the School District's non-discrimination policy.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel first held that FCA National had direct organizational standing and Pioneer High School FCA had representational organizational standing to seek prospective injunctive relief.  The School District's denial of Associated Student Body ("ASB") recognition hampered FCA National's ability to further student-engagement with the Christian faith and required it to expend significant time and resources to assist its student members.  Pioneer High School FCA had standing to pursue injunctive relief on behalf of its student members given that defendants admitted that submitting an ASB application would be futile under the current policy and plaintiffs submitted declarations showing that Pioneer High School students intended to apply for recognition in the coming year.

Addressing the merits, the panel first held that plaintiffs' motion for a preliminary injunction sought to maintain the status quo that existed before the School District's novel scrutiny of FCA—a prohibitory injunction—so the district court erred in applying the heightened standard for mandatory injunctions.

The panel held that plaintiffs would likely prevail on the merits of its selective enforcement claim under the Free Exercise Clause.  The panel stated that this case pitted two competing values that we cherish as a nation: the principle of non-discrimination on the one hand, and the First Amendment's protection of free exercise of religion and free speech on the other hand.  While this clash of values may pose a difficult policy choice, the legal outcome was much more straightforward based on the record.  Under the First Amendment, our government must be scrupulously neutral when it comes to religion:  It cannot treat religious groups worse than comparable secular ones.  But the School District did just that.  The School District engaged in selective

enforcement of its own non-discrimination policy, penalizing FCA while looking the other way with other secular student groups that maintained facially discriminatory membership criteria.  For example, the School District blessed student clubs whose constitutions limited membership based on gender identity or ethnicity, despite the school's policies barring such restricted membership.  Plaintiffs presented clear evidence that the School District selectively applied its policy against FCA because FCA requires its student leaders to abide by its statements of belief.  That means that the School District's policies were not generally applicable or neutral, triggering strict scrutiny, a standard the School District could not meet.

Concurring, Judge Lee wrote separately to highlight the depth of animus against the students' religious beliefs that pervaded the Pioneer High School campus and to explain why it was yet another reason why the School District violated the Free Exercise Clause.

Dissenting, Judge Christen stated that in light of the posture of this case, controlling precedent required dismissal of plaintiffs' appeal for lack of Article III standing.  In their haste to reach the merits of this dispute, plaintiffs urged the court to resolve fact-laden questions relevant only to their claims for past injuries, not to the prospective ones at the center of their motion for a preliminary injunction.  Rather than requiring declarations of the sort called for by *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972) and *Summers v. Earth Island Inst.*, 555 U.S. 488, 492–93 (2009), the court accepted counsel's unsupported assurances that a student intends to apply for ASB status for the 2022–23 school year.  It also selectively reviewed the record.  Both the Supreme Court and this circuit have dismissed multiple claims for lack of

standing where would-be litigants presented far more concrete and specific plans than the conclusory and unsupported declarations offered by plaintiffs. If courts are to apply the law evenly and fairly, the panel should have dismissed this appeal.

## COUNSEL

Daniel H. Blomberg (argued), Eric S. Baxter, Nicholas R. Reaves, Abigail E. Smith, and James J. Kim, Becket Fund for Religious Liberty, Washington, D.C.; Kimberlee Wood Colby, Center for Law & Religious Freedom, Springfield, Virginia; Christopher J. Schweickert, Seto Wood & Schweickert LLP, Pleasant Hill, California; for Plaintiffs-Appellants.

Stacey M. Leyton (argued) and Stephen Berzon, Altshuler Berzon LLP, San Francisco, California; Amy R. Levine, Dannis Woliver Kelley, San Francisco, California; Richard B. Katskee and Kenneth D. Upton Jr., Americans United for Separation of Church and State, Washington, D.C.; for Defendants-Appellees.

Christopher E. Mills, Spero Law LLC, Charleston, South Carolina, for Amici Curiae Campus Crusade for Christ Inc., Intervarsity Christian Fellowship/USA, Young Life, Ratio Christi, and The Navigators.

Eduardo E. Santacana, Wilkie Farr & Gallagher LLP, San Francisco, California; Kathryn Joseph, Director of Policy & Advocacy, Interfaith Alliance Foundation; for Amicus Curiae Interfaith Alliance Foundation.

Michael G. Schietzelt Jr., Robertson Center for Constitutional Law, Regent University School of Law, Virginia Beach, Virginia, for Amicus Curiae Robertson Center for Constitutional Law.

Cynthia Fleming Crawford and Casey Mattox, Americans for Prosperity Foundation, Arlington, Virginia, for Amicus Curiae Americans for Prosperity Foundation.

Howard Slugh, Jewish Coalition for Religious Liberty, Washington, D.C., for Amicus Curiae Jewish Coalition for Religious Liberty.

Keisha T. Russell, Kelly J. Shackleford, Jeffrety C. Mateer, and David J. Hacker, First Liberty Institute, Plano, Texas; Kayla A. Toney, First Liberty Institute, Washington, D.C.; for Amici Curiae D.B., Hannah Thompson, and Jacob Estell.

Kathleen L. Smithgall, Assistant Solicitor General; David M.S. Dewhirst, Solicitor General; Austin Knudsen, Attorney General of Montana; Montana Department of Justice, Helena, Montana; Steve Marshall, Alabama Attorney General; Leslie Rutledge, Arkansas Attorney General; Mark Brnovich, Arizona Attorney General; Ashley Moody, Florida Attorney General; Christopher M. Carr, Georgia Attorney General; Todd E. Rokita, Indiana Attorney General; Derek Schmidt, Kansas Attorney General; Daniel Cameron, Kentucky Attorney General; Jeff Landry, Louisiana Attorney General; Eric S. Schmitt, Missouri Attorney General; Lynn Fitch, Mississippi Attorney General; Doug Peterson, Nebraska Attorney General; John M. O'Connor, Oklahoma Attorney General; Alan Wilson, South Carolina Attorney General; Ken Paxton, Texas Attorney General; Sean D. Reyes, Utah Attorney General; Jason S. Miyares, Virginia Attorney General; Patrick

Morrisey, West Virginia Attorney General; for Amici Curiae State of Montana and 18 Other States.

Anthony J. Dick and Harry S. Graver, Jones Day, Washington, D.C., for Amicus Curiae Professor Michael W. McConnell.

Ronald G. London, Foundation for Individual Rights and Expression, Washington, D.C., for Amicus Curiae Foundation for Individual Rights and Expression.

Blaine H. Evanson, Gibson Dunn & Crutcher LLP, Irvine, California; Joseph R. Rose, Gibson Dunn & Crutcher LLP, San Francisco, California; Jun Nam, Gibson Dunn & Crutcher LLP, Palo Alto, California; for Amici Curiae Cardinal Newman Society and Christian Medical & Dental Associations.

Courtney M. Dankworth, Harold W. Williford, Joshua N. Cohen, and Isabelle M. Canaan, Debevoise & Plimpton LLP, New York, New York; Emily Martin, Sunu Chandy, Phoebe Wolfe, Auden Perino, and Hunter Iannucci, National Women's Law Center, Washington, D.C.; for Amici Curiae National Women's Law Center and Twenty-One Additional Organizations.

Mark Bresee, Alyssa Ruiz de Esparza, and Juliana Duran, Atkinson Andelson Loya Ruud & Romo, La Jolla, California; Keith Bray, Kristin Lindgren, and Dana Scott, California School Boards Association, West Sacramento, California; for Amicus Curiae California School Boards Association and its Education Legal Alliance.

**OPINION**

LEE, Circuit Judge:

This case pits two competing values that we cherish as a nation: the principle of non-discrimination on the one hand, and the First Amendment's protection of free exercise of religion and free speech on the other hand.

The Fellowship of Christian Athletes (FCA) requires students serving in leadership roles to abide by a Statement of Faith, which includes the belief that sexual relations should be limited within the context of a marriage between a man and a woman.  The San Jose Unified School District (the "School District" or "District") revoked FCA's status as an official student club at its high schools, claiming that FCA's religious pledge requirement violates the School District's non-discrimination policy.

While this clash of values may pose a difficult policy choice, the legal outcome is much more straightforward based on the record before us.  Under the First Amendment, our government must be scrupulously neutral when it comes to religion:  It cannot treat religious groups worse than comparable secular ones.  But the School District did just that.

The School District engaged in selective enforcement of its own non-discrimination policy, penalizing FCA while looking the other way with other student groups.  For example, the School District blessed student clubs whose constitutions limited membership based on gender identity or ethnicity, despite the school's policies barring such restricted membership.  The government cannot set double standards to the detriment of religious groups only.

We thus reverse the district court's denial of FCA's motion for preliminary injunction and direct the district court to enter an order reinstating FCA as an official student club.

## BACKGROUND

### I.   FCA requires its student leaders to follow its religious beliefs.

Founded in 1954, FCA is a Christian religious ministry with more than 7,000 student chapters at colleges, high schools, and middle schools across the United States. FCA's mission is "to lead every coach and athlete into a growing relationship with Jesus Christ and His church" by fostering a "steadfast commitment to Jesus Christ and His Word through Integrity, Serving, Teamwork and Excellence." FCA chapters routinely host religious discussions, service projects, prayer and worship, and Bible studies.

All students—regardless of religion or any other characteristic—are welcome to become members of FCA and participate in FCA events. But members who want to serve as leaders of FCA must personally affirm FCA's Statement of Faith and abide by FCA's Sexual Purity Statement. According to FCA, this leadership requirement "is necessary because leaders fill an important spiritual role for [the] FCA chapters," as the "vast majority of what student leaders do . . . consists of religious ministry and leadership" and "the student leaders' beliefs and conduct are vitally important to the credibility and effectiveness of each FCA chapter's ministry." One provision of the Statement of Faith requires student leaders to affirm their belief that sexual intimacy is only to be enjoyed within the confines of biblical marriage:

> We believe God's design for sexual intimacy is to be expressed only within the context of marriage. God instituted marriage between one man and one woman as the foundation of the family and the basic structure of human society. For this reason, we believe that marriage is exclusively the union of one man and one woman.

FCA's Sexual Purity Statement reads:

> God desires His children to lead pure lives of holiness. The Bible teaches that the appropriate place for sexual expression is in the context of a marriage relationship. The biblical description of marriage is one man and one woman in a lifelong commitment.

> While upholding God's standard of holiness, FCA strongly affirms God's love and redemptive power in the individual who chooses to follow Him. FCA's desire is to encourage individuals to trust in Jesus and turn away from any impure lifestyle.

No student is explicitly excluded from leadership because of their sexuality. For example, a student who is attracted to members of the same sex would still be eligible for leadership if they agree to abide by the Statement of Faith.

## II. The School District revokes FCA's recognition as an official club.

The School District officially recognizes and supports student organizations through its Associated Student Body (ASB) program. The ASB program provides students with

"practice in self-governance"; offers "social and recreational activities"; "honor[s] outstanding student achievement"; and "enhance[s] school spirit and student sense of belonging." Each fall, student-run clubs must apply for ASB recognition at their local school.  ASB recognition provides several important benefits.  Only ASB-approved clubs are (1) included on their school's official club lists and yearbook, which are key recruitment tools; (2) allowed to conduct fundraisers both on and off campus and deposit and withdraw these funds within ASB-provided bank accounts; (3) provided an official faculty advisor; and (4) given priority access to on-campus meeting space.  A wide range of student clubs have been approved by the ASB program, including Bachelor Nation, Communism Club, Girls Who Code, Mermaids Club, Persian Club, Shrek Club, and The Satanic Temple Club.

Since the early 2000s, FCA clubs have been ASB-approved at three School District high schools.  During that time, no student had ever complained to the School District that FCA's Statement of Faith had prevented them from seeking a leadership position within FCA. Nor has any student complained about feeling excluded because of FCA's religious beliefs.  And school officials have recognized that "FCA does great things on campus" and is led by "great students."  For almost two decades, FCA enjoyed the benefits of being an ASB-recognized student club without controversy.

But that all changed in April 2019 when Pioneer High School students gave their social studies teacher, Peter Glasser, a copy of an FCA Statement of Faith and Sexual

Purity Statement.[1]  The statement professed that "[t]he Bible is clear in teaching on sexual sin including sex outside of marriage and homosexual acts.  Neither heterosexual sex outside of marriage nor any homosexual act constitute an alternative lifestyle acceptable to God."  It further required FCA officers to affirm: "I understand that if I am found being involved in a lifestyle that does not conform to FCA's Sexual Purity Statement . . . I will need to step down from my leadership position with the Fellowship of Christian Athletes."

"[A]s the adult in the room," Glasser felt that he "had to react right away to the National FCA's viewpoints."  So, the next morning, Glasser hung the FCA Statement of Faith and Sexual Purity Statement on his classroom whiteboard and wrote that he was "deeply saddened that a club on Pioneer's campus asks its members to affirm these statements."  He made this public display without "tak[ing] time to determine who the [FCA] officers were" or "if any would . . . be walking into [his] room that day."

As it turns out, two FCA officers were in Glasser's first period class and were "insulted" and deeply hurt to be publicly shamed by their teacher without so much as a private conversation beforehand.  And because Glasser "react[ed] right away," he "mistakenly wrote on the board . . . that the FCA requires its members to affirm" the Statement of Faith and Sexual Purity Statement, when only leaders must do so.

A week later, Glasser forwarded this copy of the FCA Statement of Faith and Sexual Purity Statement in an email

---

[1] FCA alleges that the Purity Statement was used by a different FCA region but not for the Pioneer FCA chapter.

to Pioneer's principal, Herbert Espiritu, highlighting his concerns about FCA. Separately, Glasser explained to Espiritu and others that two of FCA's stances particularly troubled him: (1) "God approves only of relationships between one man and one woman," and (2) "God assigns our gender identities at birth based on the physical parts He gives us." According to Glasser, these "views on LGBTQ+ identity infringe on the rights of others in my community to feel safe and enfranchised on their own campus, even infringing on their very rights to exist." And Glasser "object[ed] strenuously to the 'love the sinner, hate the sin' mentality" held "by some Christians," which conflicted with "[his] truth . . . [that] being LGBTQ+ is not a choice, it's not a sin."

The key question for Glasser was "whether the national FCA's views belong on a public high school campus" because, if allowed, "there is an implicit message that Pioneer as an institution approves of these values." Glasser's answer to that question was emphatically "no." He explained to Principal Espiritu that "attacking these views is the only way to make a better campus." Glasser believed that "there's only one thing to say that will protect our students who are so victimized by religious views":

> I am an adult on your campus, and these views are bullshit to me. They have no validity. It's not a choice, and it's not a sin. I'm not willing to be an enabler for this kind of "religious freedom" anymore. LGBTQ+ kids, you deserve to have your dignity defended by the adults around you.

The next day, Pioneer's "Climate Committee"—a school leadership council led by Principal Espiritu and comprised

of the school's department chairs—convened to address the FCA controversy.  Glasser was on the committee as the social studies department chair.  And Michelle Bowman, another teacher and member of the Climate Committee, shared Glasser's negative views of FCA.  In an email she later sent to a student in November 2020, she wrote:

> Even with the Biden win, millions of people voted for the real devil.  And, evangelicals, like FCA, are charlatans and not in the least bit Christian based or they "conveniently" forget what tolerance means . . . They choose darkness over knowledge and they perpetuate ignorance.

Principal Espiritu agreed with the concerns raised about FCA, believing that the statement that FCA student leaders are required to sign "goes against core values of [Pioneer High School] (inclusive, open-mindedness)," and that the Committee "need[s] to take a united stance."  Principal Espiritu escalated the concerns about FCA to the School District administrators, and FCA was derecognized as an ASB club.  The School District concluded that FCA's Statement of Faith and Sexual Purity Statement that had been provided to Glasser violated the School District's "Non-Discrimination Policy" because "a student could not be an officer of this club, if they were homosexual," which constituted discrimination based on sexual orientation.  The Non-Discrimination Policy provides:

> All district programs and activities within a school under the jurisdiction of the superintendent of the school district shall be free from discrimination, including harassment, with respect to the actual or

perceived ethnic group, religion, gender, gender identity, gender expression, color, race, ancestry, national origin, and physical or mental disability, age or sexual orientation.

Two days after the Climate Committee meeting, Principal Espiritu informed Pioneer FCA's student leadership that the School District was immediately stripping the club of ASB approval. The school newspaper reported that the "Climate Committee and district officials made the decision to revoke [ASB] status from the FCA." Principal Espiritu was quoted as explaining that FCA's purity pledge "is of a discriminatory nature" and Pioneer "decided that we are no longer going to be affiliated with them."

FCA's derecognition was unusual. In fact, FCA was the first club in the School District to ever lose ASB recognition. Typically, Pioneer administrators would check ad hoc whether ASB clubs complied with the School District's Non-Discrimination Policy. As Pioneer's ASB Activities Director, Michelle Mayhew, explained, Pioneer administrators "generally deal[t] with these issues if they c[a]me up, if we hear[d] about them." If a club already had been recognized, Mayhew would generally not investigate whether the club's policies aligned with the Non-Discrimination Policy.

This ad hoc enforcement meant that other student clubs retained ASB recognition despite having membership—not just leadership—criteria that excluded groups of students in violation of the Non-Discrimination Policy. For example, Big Sisters/Little Sisters was approved despite its constitution limiting membership to female students. But

unlike with FCA, Mayhew never received any complaints from students or teachers about gender-limited clubs, so they maintained official status.[2]

## III.    FCA continues as a non-recognized group for the 2019–20 school year.

After being stripped of its ASB status in May 2019, Pioneer FCA was again denied ASB recognition for the 2019–20 school year.  But Pioneer's presence on campus remained a problem for some school officials.  Over the summer, Glasser sent an email to Principal Espiritu, questioning whether FCA's views violated the School District's sexual harassment policy.  According to Glasser, it was "fair to argue" that FCA's "policies on homosexuality and gender identity" create "a hostile work environment for students and faculty."  And Glasser then wondered whether the school could "ban FCA completely from campus" for violating the School District's sexual harassment policy.

Come fall, Glasser still had his sights fixed on FCA. Before the Climate Committee's first meeting of the school

---

[2] The school's selective enforcement of the All-Comers Policy was apparent during the deposition of Mayhew, who helps enforce it:

> Q. So, for this coming school year, could Girls Who Code still limit their membership to students who identify as female?
>
> A. Yes.
>
> Q. And, could the Girls' Circle, the same club we were discussing earlier, still limit their membership to students who are female identifying?
>
> A. Yes.

year, Glasser emailed the committee expressing his "eager[ness] . . . for the committee to talk about next steps [regarding FCA]." Apparently, Glasser was still intent on exploring whether the School District's "sexual harassment policy could be used in this situation" and was "an avenue [the Climate Committee] could pursue!"

Another history teacher, Danni McConnell—who was a faculty advisor to the ASB-approved club, Gay-Straight Alliance (GSA)—lamented that it was "unfortunate that there is an organization on campus" that propounds a "hurtful message." McConnell urged students to "rally[] against the issue" to "create change" on campus. And rally they did. Every FCA meeting during the 2019–20 school year was protested by Pioneer students. These protests were attended by GSA's other faculty advisor, Chanel Sulc. Sulc claimed the students were trying "to create a safer and more accepting community for all students, which necessitates that FCA not hold events on campus or reassess their purity statement and statement of faith." During one such protest, GSA members tried to enter an FCA meeting, but were blocked by a school police officer.

At one FCA meeting, reporters from the school newspaper took rapid-fire photos of every student that talked at the meeting, sticking the camera about five feet from FCA members' faces. When another student reporter "fe[lt] bad" about the newspaper's treatment of FCA, the paper's faculty advisor, Jason Goldman-Hall, referred to that student as an "idiot reporter."

## IV. FCA and several students sue the School District.

Because of the COVID-19 pandemic, student club activities ceased in spring 2020 and did not recommence until April 2021. And for the 2020–21 school year, Pioneer

granted all student clubs, including FCA, conditional ASB approval.

In the thick of the COVID-induced lull in student activities on campus, two Pioneer FCA student leaders and FCA National filed suit against the School District and several of its officials, including Principal Espiritu and Peter Glasser, in April 2020. The two student leaders, Charlotte Klarke and Elizabeth Sinclair, had first sued under their initials to avoid harassment, but the School District sought the public disclosure of their identities.  The district court agreed, ruling that "harassment at their high school ended when [they] graduated in June 2020."

In January 2021, the district court granted in part the defendants' motion to dismiss.  Undeterred, Klarke, Sinclair, FCA National, and Pioneer FCA filed in July 2021 their third amended complaint, the operative pleading here.  The plaintiffs alleged that the defendants violated their right to: (1) equal access to extracurricular school clubs under the Equal Access Act (EAA), 20 U.S.C. §§ 4701 *et seq*.; (2) Free Speech, Expressive Association, and Free Exercise of Religion under the First Amendment; and (3) Equal Protection under the Fourteenth Amendment.  Then, on July 30, 2021, the plaintiffs filed a motion for a preliminary injunction "requiring Defendants to restore recognition to student chapters affiliated" with National FCA, including Pioneer FCA, "as official [ASB] approved student clubs." The defendants again moved to dismiss in part, arguing that all plaintiffs lack standing to pursue injunctive relief.  This motion to dismiss remains pending before the district court.

## V. The School District adopts an "All-Comers Policy" for the 2021–22 school year.

Amid the ongoing litigation, the School District issued a set of new "Student Organization Guidelines" to govern ASB clubs for the 2021–22 school year. According to School District officials, this new guidance was implemented in response to the Pioneer FCA controversy and the need for more staff training on student club membership requirements. Central to the District's new ASB guidelines was the newly minted "All-Comers Policy." This policy has the same purpose as the Non-Discrimination Policy but uses somewhat different language. It requires that ASB-recognized clubs:

> Allow any currently enrolled student of the school to participate in, become a member of, and seek or hold leadership positions in the organization, regardless of his or her status or beliefs. [3]

This policy ensures that all School District "campus communities continue to be welcoming to all students" and that every student is provided an "equal opportunity" to participate in "District programs and activities." When applying for ASB recognition, all leaders of student groups are now required to sign an affirmation form agreeing to comply with the All-Comers Policy and submit a standardized club application form that includes a provision

---

[3] The guidelines state that the All-Comers Policy is to "be implemented and construed in accordance with the all comers policy" in *Christian Legal Society v. Martinez*, 561 U.S. 661 (2010).

requiring the club to affirm that it will abide by the All-Comers Policy to keep its ASB recognition.

But the new ASB guidelines permit student organizations to "adopt non-discriminatory criteria" for membership and leadership, "such as regular attendance at group meetings, participation in group events, participation in the group for a minimum period of time, or participation in orientation or training activities."  Apart from these examples, the guidelines do not define what constitutes a "non-discriminatory criteria."  Rather, school officials (either the school's Activities Director, or the principal if necessary) will rely on "common sense."  The only "bright-line criteria" are found in the School District's Non-Discrimination Policy.  For example, a club could not prevent a woman from being president because that would be gender discrimination.

Despite the All-Comers Policy, the Senior Women of Leland High School was approved as an ASB-recognized club for the 2021–22 school year, even though its constitution limited membership to female-identifying students.  Mayhew, Pioneer's Activities Director, also acknowledged that other groups could limit their membership.  She noted that the Republican student club could become ASB approved even if it required "club leaders . . . to support the Republican platform," and the Interact club could continue to require its members and leaders to "demonstrate good moral character or show leadership ability."

## VI.    The School District confirms that FCA would still not be recognized as an ASB club under the All-Comers Policy.

FCA did not apply for recognition at any School District high school during the 2021–22 school year.  According to Rigoberto Lopez (the Metro Director for FCA in the Bay Area and advisor to FCA students there), student leaders at Pioneer High School would have applied for ASB recognition but for the requirement that they agree with the All-Comers Policy.  Complying with the All-Comers Policy would have in effect prohibited FCA from "select[ing] leaders based on their agreement with the club's faith."

The students correctly believed that applying for ASB recognition would have been futile.  According to School District officials, FCA's Statement of Faith violates the All-Comers Policy.  First, requiring leaders to "affirm a belief in Christianity" excludes students of other faiths or non-religious students.  Second, requiring leaders to "affirm that marriage is exclusively the union of one man and one woman" excludes "homosexual students or those who affiliate with homosexual parents."  Principal Espiritu also confirmed that FCA would be denied ASB recognition if they maintained their leadership requirements.

## VII.    The district court denies FCA's preliminary injunction request.

In June 2022, the district court denied the plaintiffs' motion for a preliminary injunction after discovery had closed in the case.  Applying the "heightened standard" required for issuance of a "mandatory preliminary injunction," the district court concluded that plaintiffs failed to show that the "facts and law clearly favor" their position such that they are likely to succeed on the merits.

First, the district court held that the All-Comers Policy, as written, was unlikely to violate the plaintiffs' rights. According to the district court, the All-Comers Policy likely does not run aground of the EAA: it "is content-neutral because it does not preclude religious speech but rather prohibits acts of discrimination" and "has a 'non-pretextual' purpose." The district court, applying "limited public forum" analysis to the plaintiff's speech and association claims, concluded that the All-Comers Policy "is reasonable in light of the ASB program's purposes and is viewpoint and content neutral." The plaintiffs thus were unlikely to prevail on these claims. And the court further held that plaintiffs were unlikely to prevail on their Free Exercise claim because the Policy is generally applicable, "does not treat comparable secular activity more favorably than religious exercise," and only incidentally burden's their exercise of religion.

Next, the district court rejected the plaintiffs' arguments that the All-Comers Policy, as applied, violates their rights. The plaintiffs argued that the policy has been selectively enforced because the School District "has approved numerous student group applications that discriminate on one or more of the criteria listed in its non-discrimination policy." But the district court found that the plaintiffs' evidence, though "arguably [in] some tension" with the All-Comers Policy, did not establish that "any club [besides FCA] discriminates in violation of the Policy" or has "refused to sign the ASB Affirmation Form." Moreover, the district court held that the All-Comers Policy does not impermissibly allow for discretionary exceptions because the School District may not permit any club to discriminate based on a protected characteristic enumerated in the Non-Discrimination Policy.

## STANDARD OF REVIEW

We review the district court's denial of a preliminary injunction for an abuse of discretion. *See Porretti v. Dzurenda*, 11 F.4th 1037, 1046 (9th Cir. 2021). "A district court abuses its discretion . . . if it bases its decision on an erroneous legal standard or clearly erroneous findings of fact." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 468 (9th Cir. 2010). "The district court's interpretation of the underlying legal principles . . . is subject to de novo review." *Southwest Voter Registr. Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc). The district court's factual findings are clearly erroneous if they are "illogical, implausible, or without support in the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).

## DISCUSSION

### I.  *Article III Standing*

In the district court, the defendants moved to dismiss in part, arguing that all plaintiffs lack standing to seek injunctive relief. This motion remains pending. "Even though the district court has not yet ruled on standing, 'we must consider it because it governs our jurisdiction as well.'" *Yazzie v. Hobbs*, 977 F.3d 964, 969 n.5 (9th Cir. 2020) (per curiam) (quoting *City of S. Lake Tahoe v. Cal. Tahoe Reg'l Plan. Agency*, 625 F.2d 231, 233 (9th Cir. 1980)).

Klarke and Sinclair's requests for prospective injunctive relief were previously dismissed as moot when they graduated from Pioneer High School. We thus limit our inquiry to only whether either FCA National or Pioneer FCA has standing. *Nat'l Ass'n of Optometrists & Opticians Lenscrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009) ("[I]n an injunctive case this court need not address

standing of each plaintiff if it concludes that one plaintiff has standing.").

"[S]tanding requires that (1) the plaintiff suffered an injury in fact, i.e., one that is sufficiently concrete and particularized and actual or imminent, not conjectural or hypothetical, (2) the injury is fairly traceable to the challenged conduct, and (3) the injury is likely to be redressed by a favorable decision." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)) (internal quotation marks omitted). To bring a claim for prospective injunctive relief, "[t]he plaintiff must demonstrate that he has suffered or is threatened with a concrete and particularized legal harm, coupled with a sufficient likelihood that he will again be wronged in a similar way." *Id*. (internal quotation marks and citations omitted).

"[P]laintiffs may demonstrate that an injury is likely to recur by showing that the defendant had . . . a written policy, and that the injury 'stems from' that policy. Where the harm alleged is directly traceable to a written policy[,] there is an implicit likelihood of its repetition in the immediate future." *Truth v. Kent Sch. Dist.*, 542 F.3d 634, 642 (9th Cir. 2008) (quoting *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1081 (9th Cir. 2004)), *overruled on other grounds by Los Angeles County v. Humphries*, 562 U.S. 29 (2010).

## A.  FCA National has direct organizational standing.

An organization has "direct" standing to sue in its own right if it alleges "a personal stake in the outcome of the controversy as to warrant [its] invocation of federal-court jurisdiction." *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, No. 20-16774, 2022 U.S. App. LEXIS 22119, at *20–21 (9th Cir. Aug. 10, 2022) (quoting *Havens Realty Corp. v.*

*Coleman*, 455 U.S. 363, 378–79 (1982)).  The organization must establish "that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021).  "Although organizations cannot 'manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all,' they can establish standing by showing that they 'would have suffered some other injury' had they 'not diverted resources to counteracting the problem.'" *Sabra*, 2022 U.S. App. LEXIS 22119, at *21–22 (quoting *E. Bay Sanctuary*, 993 F.3d at 663).  For example, in *Sabra* we held that a nonprofit organization "committed to advocacy and protecting the civil rights of American Muslims" had standing to bring a First Amendment challenge against allegedly Islamophobic course materials taught by a community college professor because the organization "had to divert its resources to create a campaign correcting the Islamophobic information," which required contracting with a religious scholar to develop materials for the campaign. *Id.* at *22–24.

FCA's mission is "to lead every coach and athlete into a growing relationship with Jesus Christ and His church." FCA's local student chapters are the primary way the organization increases student engagement with Christianity.  With ASB recognition, FCA would be included in the school yearbook and official club list, would be able to fundraise on and off campus, and would have priority access to campus space for hosting events.  By denying these benefits, the School District has hampered FCA's ability to further student-engagement with the Christian faith.  We thus conclude that the School District's

denial of ASB recognition has and continues to frustrate FCA National's mission.

FCA National has also had to devote a "huge amount of staff time, energy, effort, and prayer that would normally have been devoted to preparing for school or ministry" to "support the FCA student leaders" after FCA's derecognition. For example, Rigoberto Lopez from FCA National has spent significant time "communicating with District officials to explain FCA's stances," and FCA has spent "over $10,000" preparing "correspondence to the District to inform it of students' rights under the First Amendment and Equal Access act." "Diverted staff time is a compensable injury" when it is "caused by the [challenged government action]." *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1166 (9th Cir. 2013); *see also Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (holding that an organizational plaintiff had standing because it "showed a drain on its resources" caused by combating housing violations). Because FCA National has had to devote significant time and resources to assist its student members because of derecognition, we hold that it has organizational standing.

## B. Pioneer FCA has representational organizational standing.

Organizations also have standing to bring suit on behalf of their members if "(1) at least one of its members would have standing to sue in his own right, (2) the interests the suit seeks to vindicate are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Fleck & Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1105–06 (9th Cir. 2006). The defendants do not dispute the second and third prongs, and we conclude that

they are satisfied.  The defendants, however, maintain that none of Pioneer FCA's student members have standing to sue.

The plaintiffs argue that Pioneer FCA's student leaders are likely to suffer harm because any future application for ASB recognition during the 2022–23 school year will be denied.  The defendants admit that submitting an ASB application would be futile under the current policy.  *See Truth*, 542 F.3d at 642; *see also Taniguchi v. Schultz*, 303 F.3d 950, 957 (9th Cir. 2002) "(We have consistently held that standing does not require exercises in futility."). Still, the defendants argue that the plaintiffs cannot establish a "real and immediate threat of repeated injury" because "no students applied for recognition of an FCA club" during the 2021–22 school year, and "there is no evidence that any students intend to seek ASB recognition in fall 2022."

We disagree.  Rigoberto Lopez, FCA National's student advisor, submitted multiple declarations showing that Pioneer students intend to apply for recognition.  The second declaration from September 2021 identifies four Pioneer students—M.H., N.M., M.C., and M.V.—who "confirmed that they plan[ned] to either lead or continue their membership in Pioneer FCA in the coming year."  Lopez also declares that "Pioneer FCA's leadership will apply for ASB recognition" if an injunction is granted.  In the third declaration from May 2022, Lopez discussed FCA's "plans to grow the group during the 2022–23 school year" and that "the club confirmed . . . Pioneer FCA's leadership for the 2022–23 school year," which includes N.M.  Thus, at least one of Pioneer FCA's student leaders for the 2022–23 school year, N.M., has stated an intention to apply for ASB recognition if an injunction is granted.

The dissent, however, claims the declarations are deficient because the "*most recent declaration* says nothing at all about whether N.M. intends to apply for ASB recognition for the upcoming 2022–23 school year." But we should not review each declaration in isolation, ignoring that N.M. earlier indicated his/her intent to apply for ASB recognition. We are unpersuaded that the plaintiffs were required to restate the obvious, especially where First Amendment rights are threatened. *See LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000) ("[W]hen the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing.").[4]

Additionally, the defendants dismiss the Lopez declarations as "hearsay and speculation," and criticize the plaintiffs for not providing "evidence from actual students, who are the only ones who may apply for ASB recognition."

[4] The dissent also relies on several environmental standing cases to argue that N.M.'s plans to apply for ASB recognition are too speculative. *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 490 (2009); *Lujan*, 504 U.S. at 563–64; *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972). But these cases are readily distinguishable because the future aesthetic harms alleged by the plaintiffs are truly speculative: they would only occur if the plaintiffs traveled to certain wilderness areas affected by the challenged governmental regulation at certain times. *See Summers*, 555 U.S. at 495–96 (plaintiff's allegation that he "plans to visit several unnamed national forests in the future" insufficient to confer standing because it is unlikely that plaintiff's "wanderings will bring him to a parcel affected" by the challenged regulation); *Lujan*, 504 U.S. at 563–64 (past travel to habitat and statement of intent to revisit habitat at some unspecified time insufficient to show imminent injury); *Sierra Club*, 405 U.S. at 735 (organization lacked standing because it failed to allege that its members use the particular wilderness area affected by the proposed governmental actions). But here, harm is certain if Pioneer FCA applies for ASB recognition. And we know N.M. wants to apply for recognition. Moreover, we know when this harm will occur—on the day ASB applications are due for the 2022-23 school year.

But hearsay evidence may be considered when deciding whether to issue a preliminary injunction. *See, e.g.*, *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (en banc). And the defendants ignore the reason why no student testimony was submitted: the parties stipulated that, in exchange for the School District declining to depose any non-party students, the plaintiffs would not introduce any testimony from them. This stipulation was made to protect N.M. and other FCA student leaders who felt intimidated after receiving deposition notices from School District counsel, despite not being parties or witnesses in the litigation. The defendants cannot fault the plaintiffs for failing to submit evidence which they agreed not to require.[5] Therefore, we also hold that Pioneer FCA has standing to pursue injunctive relief on behalf of its student members.

## II. *FCA's Motion for Preliminary Injunction*

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). We evaluate "these factors on a sliding scale, such 'that a

---

[5] If the plaintiffs, through Lopez, had tried to submit evidence from non-party student leaders that went to the merits of their claims, we would be concerned that the plaintiffs would be enjoying the benefits of the stipulation while circumventing their obligations thereunder. But because the non-party student leaders, including N.M., have a track record of participating in FCA from which we can infer future participation, and because we must "*sua sponte* assure ourselves of [the plaintiffs'] standing," *Interpipe Contr., Inc. v. Becerra*, 898 F.3d 879, 891 n.9 (9th Cir. 2018), it is appropriate to consider the Lopez declarations here.

stronger showing of one element may offset a weaker showing of another.'"  *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).  When the balance of equities "tips sharply in the plaintiff's favor," the plaintiff must raise only "serious questions" on the merits—a lesser showing than likelihood of success.  *See Wild Rockies*, 632 F.3d at 1134–35; *see also Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

## A. The district court abused its discretion by applying the "heightened standard" for mandatory injunctions.

To start, we need to address whether FCA seeks a "mandatory" or a "prohibitory" preliminary injunction. That matters because the moving party's burden differs between the two.  "A mandatory injunction orders a responsible party to take action, while [a] prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits."  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014) (internal quotation marks and citation omitted). Mandatory injunctions are "particularly disfavored," *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009), and should be denied "unless the facts and law *clearly* favor the moving party," *Stanley v. University of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (emphasis added) (internal quotation marks omitted).

We ask whether the plaintiffs seek to maintain or alter the status quo.  "The 'status quo' refers to the legally relevant relationship *between the parties* before the controversy arose."  *Ariz. Dream*, 757 F.3d at 1061 (emphasis in original); *see also Regents of Univ. of Cal. v. Am. Broad.*

*Cos.*, 747 F.2d 511, 514 (9th Cir. 1984) (The relevant status quo is "the last, uncontested status which preceded the pending controversy.") (internal quotation marks and citation omitted)).

The district court determined that the "controversy arose" in April 2020 when the plaintiffs filed suit. *Ariz. Dream*, 757 F.3d at 1061. At that time, no FCA group had ASB recognition at any of the schools. Because the plaintiffs seek an injunction requiring ASB recognition, the district court concluded that they want to alter the status quo. In response, the plaintiffs say the "controversy arose" when the School District derecognized FCA in May 2019. Before then, FCA enjoyed ASB-approved status. Thus, by seeking "resumed equal access to ASB-approved status," they are requesting a "return to the status quo."

We agree with the plaintiffs. When we said that the status quo is the "relationship between the parties before the controversy arose," *id.*, we did not intend to peg the status quo determination to the somewhat arbitrary date the lawsuit was filed. Rather, the controversy arises when the events forming the plaintiffs' claim transpire, and we determine the status quo by looking at the relationship in existence before those events occurred.

For example, in *Arizona Dream*, DACA recipients sought a preliminary injunction prohibiting Arizona officials from enforcing the state's new policy that prohibited them from obtaining Arizona driver's licenses. *Id.* at 1057–60. The district court defined the status quo based on the policy in force when the DACA plaintiffs filed suit, under which the "Defendants did not issue driver's licenses to Plaintiffs." *Id.* at 1061. But we held that the "district court erred in defining the status quo" because the state's new policy gives rise to their claims, and the plaintiffs were eligible to receive

driver's licenses before that policy went into effect. *See id.* Thus, "[b]y revising their policy," it was the defendants that "affirmatively changed this status quo," and not the plaintiffs. *Id.*

Here, FCA enjoyed ASB recognition since the early 2000s. But in Spring 2019, a controversy arose when certain Pioneer officials sought derecognition of FCA. The plaintiffs' claims are grounded in the series of events that occurred during the derecognition process. And because the plaintiffs request an injunction to remedy constitutional violations allegedly infecting the derecognition determination, we hold that the status quo was the ASB-approved status enjoyed by FCA before derecognition. And plaintiffs' motion for a preliminary injunction seeks to maintain this status quo that existed before the School District's novel scrutiny of FCA—a prohibitory injunction—so the district court erred in applying the heightened standard for mandatory injunctions. *See Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1123 (9th Cir. 2014).

## B. FCA will likely prevail on the merits of its selective enforcement claim under the Free Exercise Clause.

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. CONST. amend. I. The Free Exercise Clause "stands as a recognition that . . . divine authority may exist and, if it exists, has a rightful claim on the allegiance of believers who happen to be American citizens." Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1516 (1989). The use of the term "free exercise" in the First Amendment—rather than "rights of

conscience" in the initial draft—"makes clear that the clause protects religiously motivated conduct as well as belief." *Id.* at 1488.

Given this historical backdrop, the Supreme Court has held that the government "cannot impose regulations that are hostile to religious . . . beliefs" and "cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018). FCA's beliefs about marriage and sexuality fall within the ambit of the First Amendment. As the Supreme Court reminded us, "religious and philosophical objections to gay marriage are protected views." *Id.* at 1727. To be sure, some—maybe even most—people may find such views passé. And we do not minimize the ostracism that gay and lesbian students may endure because of those views. But in our pluralistic society in which people from diverse backgrounds must coexist despite having starkly different worldviews, the Free Exercise Clause requires the government to respect religious beliefs and conduct, even if many people may find such beliefs to not be "acceptable, logical, consistent, or comprehensible." *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021).

We apply strict scrutiny to government regulations that burden religious exercise unless those laws are neutral and generally applicable. *See id.* (citing *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 878–82 (1990)). A law is not neutral and generally applicable if it is selectively enforced against religious entities but not comparable secular entities. *See Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam); *Alpha Delta Chi-Delta Chapter. v. Reed*, 648 F.3d 790, 804–05 (9th Cir. 2011). "[W]hether two activities are comparable for purposes of the

Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon*, 141 S. Ct. at 1296. Nor is a law neutral and generally applicable if the government has discretion to exempt secular groups from the strictures of the law. *See Fulton*, 141 S. Ct. at 1877. The reason is obvious: if a government can easily grant an exemption, then the law stops being applied neutrally or generally. *See id.* Finally, the "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Id.*

Under strict scrutiny, the government can prevail only if it shows that its restrictions on religion "are justified by a compelling interest and [are] narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). Given that high bar, the defendants do not argue that their policies can pass muster under strict scrutiny; rather, they contend that strict scrutiny does not apply at all because their policies are neutral and generally applicable.

But the record before us shows that the School District's non-discrimination policies have been, and continue to be, selectively enforced against FCA. Other secular student groups maintain *facially* discriminatory membership criteria but enjoy ASB recognition. In short, the School District targeted FCA because of its religious-based views about marriage and sexuality, and not merely because of its alleged violation of non-discrimination policies.[6]

---

[6] The plaintiffs also argue that the School District's policies facially violate the EAA, and their First Amendment rights of free speech, association, and free exercise of religion. The School District responds

If the defendants selectively enforced their policies against FCA only, then those policies are not generally applicable or neutral.  *See Alpha Delta*, 648 F.3d at 804–05 (concluding that evidence showed the non-discrimination policy may have been selectively enforced where secular student groups were granted exemptions from the policy); *Truth*, 542 F.3d at 650–51 (holding that religious student group's allegation of selective enforcement of non-discrimination policy presented a colorable claim).  That means we must apply strict scrutiny to the defendants' actions—a standard under which the School District's policies cannot survive.

Put differently, if the School District's policies are selectively enforced, the plaintiffs will likely prevail on the merits of their Free Exercise claim.  And here plaintiffs have presented evidence that the defendants selectively enforced—and continue to selectively enforce—the Non-Discrimination and All-Comers Policies against FCA while exempting secular ASB student groups.

---

that this position conflicts with binding precedent.  In *Christian Legal Society v. Martinez*, the Supreme Court held that an All-Comers Policy identical to the School District's here did not run aground of the EAA or the First Amendment.  *See* 561 U.S. 661, 669 (2010).  We also held that similar non-discrimination policies do not violate the EAA or First Amendment.  *See Alpha Delta*, 648 F.3d at 800–01; *Truth*, 542 F.3d at 647–50.  The plaintiffs reply that our decision in *Truth* only approved of non-discrimination policies as applied to student members but not its leadership and rely on *Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839 (2d Cir. 1996), which held that impeding a group's ability to exclude non-Christians from leadership positions violated the EAA.  *Id.* at 859.  We need not decide these issues or address the plaintiffs' and certain amici's argument that intervening Supreme Court decisions have undercut *Martinez* and *Truth* because we hold that the plaintiffs will likely prevail on their as-applied challenges.

### a. Selective enforcement of the All Comers Policy.

The defendants argue that FCA is the only student group that maintains discriminatory leadership or membership criteria, so there is no evidence that the School District has selectively enforced the All-Comers Policy against FCA. Unrebutted evidence presented by plaintiffs belies this assertion. The ASB-recognized Senior Women of Leland High School maintains a discriminatory membership criterion that violates the All-Comers Policy.

The Senior Women Club's mission is to "connect the school's women with local events." The club's constitution limits membership based on gender identity. Even though the Senior Women Club explicitly stated its intention to exclude males from membership—*i.e.*, that they intend to discriminate based on gender identity in violation of the All-Comers Policy—the School District still granted it ASB recognition. This alone shows selective enforcement by the School District. *See id.* at 650 (holding that Men's and Girl's Honor Clubs, which discriminate based on gender yet were granted ASB recognition, demonstrated selective enforcement).

To be clear, there may be very good reasons for the Senior Women Club to have restricted membership. A female-only group may enhance mentorship, camaraderie, and networking for its members. But the School District's All-Comers policy does not carve out exceptions for "benign" discriminatory membership rules. *Cf. Adarand Constrs. v. Pena*, 515 U.S. 200, 226–27 (1995) (applying strict scrutiny to "benign" racial classifications). Simply put, the Senior Women Club's constitution violates the School District's All-Comers policy, yet the School District recognizes it as an ASB student club.

Still, the defendants argue that the Senior Women Club's discriminatory membership rule should be excused because the club agreed to comply with the All-Comers Policy when it signed the school's standardized club application form. The district court charitably said that there was "arguably some tension" between the Senior Women club's membership criteria and its affirmation of the All-Comers Policy.  The district court then resolved this "tension" in the School District's favor because the plaintiffs had not proven that the Senior Women Club actually discriminates based on gender identity.

The district court clearly erred.  First, the Senior Women Club's discriminatory membership criterion and the All-Comers Policy are not merely in "some tension."  Rather, they are diametrically opposed to each other—only one can be true.  Either membership is open only to female students or it is open to all students.  And the club specified on the application form required by the School District for the 2021–22 school year that its membership was open only to "seniors who identify as female."  We fail to see how this club can maintain its restrictive membership criteria while complying with the All-Comers Policy.

The district court relied on the boilerplate nondiscrimination statement in the club application form that the Senior Women Club's student leader signed as proof that the club does not discriminate based on gender identity. True, the boilerplate statement in this form does have the School District's required non-discrimination language in it. But the Senior Women club modified that form twice by handwriting in discriminatory membership conditions based on gender identity.  First, as noted above, the Senior Women Club's leader handwrote that only "seniors who identify as female" can become members.  To accentuate this point, she

then handwrote that a student will no longer be considered a member if the student "is not a senior who does not identify as female." In other words, the Senior Women Club modified the terms of ASB participation when it inserted its gender-based membership conditions into its club application form submitted for ASB approval. And when the School District approved the Senior Women Club's application, it assented to the club's discriminatory condition. *Cf.* 1 Corbin on Contracts § 3.35 (2022) ("If the party who made the prior offer expresses assent to the terms of the counter-offer, a contract is thereby made on those terms.").

Whether the plaintiffs can set forth specific instances when the Senior Women Club has discriminated against males is irrelevant under the School District's reasoning. The School District has repeatedly emphasized that the mere existence of FCA's religious beliefs was enough to deny ASB recognition, regardless of any affirmation to the contrary. And according to the School District, FCA will be denied recognition so long as it maintains its student leadership requirements, even though there is no evidence that FCA has ever denied a student leadership application because the student disagreed with FCA's statements of belief. So, whether the Senior Women Club actually discriminates is beside the point. The mere existence of the Senior Women Club's discriminatory criteria should likewise require denying it ASB recognition. But instead, the School District welcomed this club.[7]

---

[7] We also question whether a club's mere affirmation that it will follow the All-Comers Policy is in fact meaningful. For example, Big Sisters/Little Sisters is obviously intended for female students only; it is unclear that a male student would or should try to serve as a mentor or

The dissent criticizes us for crediting the plaintiffs' evidence of Senior Women Club's discriminatory membership policy because "it is not our role to find facts." We agree that such fact finding would be inappropriate if there was any real dispute that the Senior Women maintain discriminatory membership criteria.  But the School District admits that the discriminatory criteria exists and "under the District's policy the . . . activities director should have required the Senior Women Club to clarify or modify their handwritten characterization of their members or else disapproved the application."  We are not required to shut our eyes to "uncontested facts" found within the record, *Fortyune*, 364 F.3d at 1083.

Given this unrebutted evidence that the School District has exempted a secular group from its All-Comers Policy, the defendants respond by suggesting that the Supreme Court in *Fulton* only banned *formalized* exemptions for secular groups.  Because the School District's All-Comers Policy provides no facial exemptions, the defendants appear to argue that the School District's conduct is permissible. But this cramped and distorted reading of *Fulton* misinterprets the guardrails of "neutral" and "generally applicable" laws.  While *Fulton* did involve formalized

---

seek guidance through this group.  Big Sisters/Little Sisters may have affirmed the All-Comers Policy on the School District's form, but the club's name and mission is obviously gender-specific. At oral argument, the defendants' counsel highlighted how little the affirmation means: she conceded that a White nationalist group would not run afoul of the School District's All-Comers Policy or its Non-Discrimination Policy so long as the group signed the affirmation statement and club application form stating that anyone could join the group.  Not only does such a formalistic litmus test fall short of serving the School District's goal of inclusiveness, but it appears to penalize student groups that are truthful about their mission and membership.

exemptions to the city's anti-discrimination policy for placing foster care children, the Court found problematic the *discretion* that the government enjoyed in exempting secular groups while enforcing the policy against the Catholic Social Services for its opposition to same-sex married couples. *Fulton*, 141 S. Ct. at 1878.  If anything, the School District's unspoken and ad hoc exemption practice poses a more insidious and severe danger to the Free Exercise right than the formalized exemptions in *Fulton*: It provides the School District almost unfettered and silent discretion to make exceptions.

In short, plaintiffs have presented clear evidence that the School District selectively applies its All-Comers Policy against FCA because FCA requires its student leaders to abide by its statements of belief.  That means that the School District's policies are not generally applicable or neutral, triggering strict scrutiny.  *Tandon*, 141 S. Ct. at 1296.  And that, in turn, is the ballgame.  At this stage, the plaintiffs have shown that they are likely to prevail on their selective-enforcement claim.[8]

---

[8] We also note that the School District's policies likely conflict with the Supreme Court's holding in *Tandon* that religious groups should be treated the same as comparable secular groups. *See, e.g.*, *Seals v. Austin*, No. 4:21-cv-01236-O, 2022 U.S. Dist. LEXIS 65937, at *35–36 (N.D. Tex. Mar. 28, 2022) (holding that the Navy's COVID-19 vaccine requirement likely violates *Tandon* because it "blatantly treats those who applied for medical exemptions more favorably than" those who sought religious exemptions).  The School District allows secular student groups to impose their own (secular-based) moral code for membership.  For example, the Interact club requires its members and leaders to "demonstrate good moral character."  But the School District does not allow religion-based moral requirements.  The government cannot sanction moral requirements for secular groups but ban them for religious groups.

### b. Selective enforcement of the Non-Discrimination Policy.

The School District's refusal to apply the All-Comers Policy against the Senior Women Club shows that the plaintiffs will likely prevail on the merits.  But this double standard was no aberration.  It has repeatedly looked the other way when secular ASB organizations maintained discriminatory membership and leadership criteria that violated the School District's policies before the All-Comers Policy went into effect during the 2021–22 school year.

For example, Girl Talk and Big Sisters/Little Sisters limited membership to female-identifying students, which violated the Non-Discrimination Policy's prohibition against gender identity discrimination.  The South Asian Club also "prioritize[d]" members who were South Asian.  Yet these clubs retained ASB recognition because, as Pioneer's Activities Director admits, the school never received any complaints from students or teachers about these gender- or ethnicity-limited clubs.

The defendants argue that we cannot consider these past instances of selective enforcement of the then-controlling Non-Discrimination Policy when evaluating prospective relief because the School District has since implemented the "new" All-Comers Policy.  We disagree.  Past examples of selective enforcement inform whether the School District is still selectively enforcing the "new" All-Comers Policy because these two policies are effectively one and the same.  Indeed, the School District's counsel at oral argument walked away from the assertion that the All-Comers Policy is "new":  She represented that "[the All-Comers Policy] is not a change in practice . . . and what [the School District] was implementing in 2021 was a formalization of a long-standing practice of the School District."

In other words, the "new" policy is just a rebranding. The Non-Discrimination Policy and the All-Comers Policy are substantively identical.  Based on their language, both policies purport to bar discrimination.  Both policies also have the effect of excluding FCA from ASB while allowing secular groups that discriminate based on protected characteristics to maintain ASB status.  And both policies were enacted and implemented by the same School District and Pioneer officials that expressed hostility towards FCA's religious views (more on that later).

Notably, the School District formalized the All-Comers Policy shortly after plaintiffs filed this lawsuit.[9]  The School District then argued (as it does now) that the court cannot consider its prior conduct under the "old" policy in deciding the plaintiffs' request for prospective relief from the "new" policy.  But there is little daylight between the School District's "old" and "new" policies.  Much like putting lipstick on a pig does not change that it is still a pig, the School District cannot cleanse itself by cosmetically tweaking its professed long-standing practice.

Based on the evidence presented, the Non-Discrimination Policy and the All-Comers Policy are inextricably linked and have been used selectively to deprive FCA of ASB recognition at the same time that secular clubs that discriminate on protected grounds have maintained ASB recognition. *See United States v. St Louis-San Francisco Ry.*

---

[9] Because of the COVID-19 pandemic, all student groups, including FCA, received provisional ASB recognition during the 2020-21 school year.  The All-Comers Policy was thus purportedly not implemented until the 2021-22 school year despite being approved over a year earlier. Thus, any temporal gap between FCA's lawsuit and the School District's development of the All-Comers Policy is artificially larger than it appears.

*Co.*, 464 F.2d 301, 307 (8th Cir. 1972) (When a "current policy serves to perpetuate the effects of past discrimination, although neutral on its face, it rejuvenates the past discrimination in both fact and law regardless of present good faith.") (internal quotation marks and citation omitted)); *accord Hulteen v. AT&T Corp.*, 498 F.3d 1001, 1006 (9th Cir. 2007). We thus conclude that the defendants' selective enforcement of the "old" Non-Discrimination Policy is relevant to the likelihood that FCA will suffer future harm under the "new" All-Comers Policy. Again, this evidence of selective enforcement means that we must apply strict scrutiny, a standard that the School District's policies cannot meet. *See Church of the Lukumi*, 508 U.S. at 546–47 (holding that strict scrutiny can be satisfied "only in rare cases," and laws which are "underinclusive" as written or applied cannot be upheld).[10]

## C.  FCA Will Suffer Irreparable Harm.

"[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009) (quoting *Elrod v. Burns*, 427

---

[10] The EAA prohibits content-based discrimination within a "limited open forum" such as the District's ASB program. *See* 20 U.S.C. § 4071(a)–(b). We rely on First Amendment law when analyzing EAA claims because "content neutrality for purposes of the [EAA] is identical to content neutrality for First Amendment claims." *Alpha Delta*, 648 F.3d at 802 n.5. A facially content-neutral ordinance may still be unconstitutional if it is selectively enforced based on the content of speech. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005). Thus, the plaintiffs' EAA claim rises and falls with their Free Exercise claim premised on selective enforcement. Because the School District has selectively enforced its non-discrimination policies against FCA, the policies as applied are content-based. *Id.* Thus, the plaintiffs also are likely to prevail on their EAA claim.

U.S. 347, 373 (1976)).   "[A] party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim."  *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 973 (9th Cir. 2002) (internal quotation marks and citation omitted).  As already discussed, plaintiffs have more than a colorable claim that their Free Exercise rights have been, and continue to be, violated. And depriving a student group of recognition at the beginning of the new school year constitutes irreparable harm because it hampers the group's ability to further its mission and recruit new members. *See Bible Club v. Placentia-Yorba Linda Sch. Dist.*, 573 F. Supp. 2d 1291, 1300 (C.D. Cal. 2008) ("[K]eeping the [Christian student] group off campus" at the start of the school year will "sabotage its efforts to recruit students when they are most available, permanently stunting the size of the group's membership.").   Without an injunction mandating ASB recognition for the 2022–23 school year, FCA will be irreparably harmed by the denial of full ASB benefits. This factor weighs in favor of injunctive relief.

### D. Balance of Equities and Public Interest Favor FCA.

When, as here, the party opposing injunctive relief is a government entity, the third and fourth factors—the balance of equities and the public interest—"merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Because the plaintiffs are likely to succeed on their Free Exercise claims, the balance of equities and the public interest favor injunctive relief. *See Am. Bev. Ass'n v. City & Cty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) ("[T]he fact that [Plaintiffs] have raised serious First Amendment questions compels a finding that . . . the balance of hardships tips sharply in [Plaintiffs']

favor," and "we have consistently recognized the significant public interest in upholding First Amendment principles." (internal quotation marks and citations omitted)).

Without injunctive relief, FCA's membership may continue to dwindle and, eventually, the club may cease to exist District-wide. Moreover, "the clock is ticking down" for students within the School District that desire to lead or participate in FCA but may graduate without that opportunity. *See Bible Club*, 573 F. Supp. 2d at 1300 (stating that club members "have an urgent interest in making the most of their adolescence"). By contrast, the School District would not be harmed by granting an injunction. There would simply be a return to the status quo that existed for almost two decades within the School District before May 2019: FCA students participating within the ASB program on equal footing with other student groups. The defendants argue that the "District's objective to spare its students the harms of discrimination and exclusion is weighty" and is a "public policy of the highest order." We are sensitive to this important interest. But the School District cannot—and does not—advance its interest in non-discrimination by discriminating. The balance of equities and public interest thus favor injunctive relief.

## CONCLUSION

The plaintiffs are likely to succeed on their Free Exercise claims alleging that the defendants have selectively enforced their non-discrimination policies. The remaining factors support granting the plaintiffs' requested injunctive relief. Therefore, we **REVERSE** the district court's denial of FCA's motion for a preliminary injunction and direct the

district court to enter an order reinstating FCA's ASB recognition.[11]

LEE, Circuit Judge, concurring:

Under the First Amendment, the government must "proceed in a manner neutral toward and tolerant" of people's "religious beliefs." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018). The School District contends that there is not a "whiff of antireligious animus" motivating its actions. The record, however, belies that assertion.

One schoolteacher called the Fellowship of Christian Athletes' (FCA) beliefs "bullshit" and sought to ban it from campus. Another described evangelical Christians as "charlatans" who perpetuate "darkness" and "ignorance." And yet another teacher denigrated his own student as an "idiot" for empathizing with FCA members who faced backlash from teachers and students.

This is not, to put it mildly, neutral treatment of religion. More than a whiff, a stench of animus against the students'

---

[11] The plaintiffs also appeal the district court's denial of their two motions to supplement the preliminary injunction record. Because the district court failed to provide any explanation for denying the motions and because the evidence—namely, Lopez's third declaration—is highly relevant for determining standing, we reverse the district court's denial of plaintiffs' motions to supplement the preliminary injunction record. *See Ocean Beauty Seafoods, LLC v. Pac. Seafood Grp. Acquisition Co.*, 611 F. App'x 385, 387 (9th Cir. 2015) (holding district court's denial of motion to supplement preliminary injunction record was an abuse of discretion because "some of the excluded documents . . . were highly relevant to the issues").

religious beliefs pervades the Pioneer High School campus. I write separately to highlight the depth of that animus and explain why it is yet another reason why the School District violated the Free Exercise Clause.

\* \* \* \* \*

In *Masterpiece Cakeshop*, the Supreme Court considered the interplay between a baker's religious objection to making a wedding cake for a gay couple and the state's interest in protecting its citizens from discrimination while seeking goods and services. *Id.* at 1723. The Supreme Court recognized the government's interest in "protect[ing] the rights and dignity of gay persons who are, or wish to be, married but who face discrimination when they seek goods or services." *Id.* at 1723. But the Court also acknowledged that "religious and philosophical objections to gay marriage are protected views," and "[t]he First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths." *Id.* at 1727 (quoting *Obergefell v. Hodges*, 576 U.S. 644, 679–80 (2015)). In balancing these competing interests, the government must be "neutral and respectful" and may not display "hostility toward . . . sincere religious beliefs." *Id.* at 1729.

To determine whether the government has complied with its duty of neutrality, we assess "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Id.* at 1731 (quoting *Church of the Lukumi*, 508 U.S. at 540).

The Supreme Court in *Masterpiece Cakeshop* held that the Colorado Civil Rights Commission displayed "clear and impermissible hostility" when considering the baker's religious objection. *Id.* at 1729. The "commissioners endorsed the view that religious beliefs cannot legitimately be carried into the public sphere or commercial domain." *Id.* Another commissioner described the baker's faith as "one of the most despicable pieces of rhetoric that people can use," which disparaged his religion in two ways: "by describing it as despicable, and also by characterizing it as merely rhetorical—something insubstantial and even insincere." *Id.* This commissioner also criticized religious freedom generally as pretext for discrimination, even going "so far as to compare [the baker's] invocation of his sincerely held religious beliefs to defenses of slavery and the Holocaust." *Id.* Furthermore, the "record show[ed] no objections to these comments from other commissioners." *Id.*

Here, Pioneer's Climate Committee—the body that led the district-wide push for FCA derecognition—had members that expressed remarkably similar hostile statements. Peter Glasser was the most forthcoming about his contempt for FCA's religious beliefs. The day after learning about FCA's religious-based views on marriage and sexuality, Glasser channeled his inner Martin Luther, pinning the Statement of Faith and Sexual Purity Statement to his classroom whiteboard along with his grievances. But instead of a reformation, Glasser demanded an inquisition. As he explained in emails sent to Principal Espiritu, FCA's "bullshit" views "have no validity" and amount to heresy because they violated "my truth." Glasser believed "attacking these views is the only way to make a better campus" and proclaimed that he would not be an "enabler for this kind of 'religious freedom' anymore."

Glasser's desire to attack FCA's views makes plain that FCA, putting it charitably, was "less than fully welcome" on Pioneer's campus.  *Id.*  Glasser's comments also improperly imputed insincerity to FCA's religious views by referring to their beliefs as an exercise in (air quotes) "religious freedom."  *See id.*

Glasser was not the only skeptic.  Michelle Bowman also serves on the Climate Committee and as faculty advisor to the Satanic Temple Club.  In discussing this lawsuit with a former student, she opined that "evangelicals, like FCA, are charlatans and not in the least bit Christian," and "choose darkness over knowledge and they perpetuate ignorance." But it is not for Bowman to dictate what beliefs are genuinely Christian.  *Id.* at 1731 (The government cannot "pass[] judgment upon or presuppose[] the illegitimacy of religious beliefs.").  Nor should the government disfavor religious-based beliefs, even if many may view them as not "acceptable, logical, consistent, or comprehensible."  *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021).

With these two individuals in the room, the Climate Committee concluded that FCA's Statement of Faith and Sexual Purity Statement go against Pioneer High School's core values and that the Committee "need[s] to take a united stance" against FCA.  The Committee's unity suggests there was little to no push back against Glasser and Bowman's views.  *Masterpiece Cakeshop*, 138 S. Ct. at 1729.  So does the speed of the derecognition decision—two days later, Principal Espiritu informed FCA that they had lost recognition without giving FCA's students any opportunity to defend themselves or their organization.  At least the baker in *Masterpiece Cakeshop* had a chance to be heard.  *Id.* at 1726.

Equally telling was the continued hostility towards FCA even after it lost ASB recognition and thus could not possibly violate the School District's non-discrimination policies.  In an effort "to ban FCA completely from campus," Glasser ginned up another potential "avenue" of attack during Summer 2019.  He posited that FCA could be accused of violating the School District's sexual harassment policy by creating "a hostile work environment for students and faculty."  In other words, *teenagers*—meeting privately to discuss the Bible—were creating a hostile work environment for *adult faculty*, according to Glasser.   There is no indication in the record that Glasser's inimical view of FCA was rebuffed.[1]

The defendants contend that any past animus is legally irrelevant for two reasons.  First, they argue that the School District, and not the Climate Committee, made the decision to derecognize FCA, and this "decision was based solely on the club's violation of the [non-discrimination] policy." Second, they contend that past animus has no bearing on whether the plaintiffs are likely to suffer future harm— denial of ASB recognition—during the 2022–23 school year, when the School District's new All-Comers Policy is in force.  The defendants are wrong on both points.

The School District is incorrect that our animus inquiry must be strictly limited to the actions or words of the "decisionmakers."   As the Supreme Court held, we may

---

[1] The dissent points out that the principal apparently "coached" Glasser about "how to consider the way students might respond" when he posted the FCA documents in his classrooms and criticized them on the whiteboard.  But other than that, the School District took no other action: it did not conduct any investigation into Glasser's actions and did not ever "reach" the "conclusion" that Glasser's conduct was "improper."

assess "the historical background" and "specific series of events leading" to the decision in question.  *Id.* at 1731.[2]  And the "historical background" and "series of events" leading to FCA's derecognition included animus against FCA's religious beliefs by multiple Pioneer officials.

The events preceding FCA's derecognition are of special importance here because the School District relied on receiving complaints in enforcing its Non-Discrimination Policy.  Absent Glasser's call for action and pressure, the Climate Committee may have never broached FCA's Statement of Faith and Sexual Purity Statement and its ASB status.  And but for the Climate Committee's "united stance" against FCA, the controversy would not have been escalated to the School District.  So even if it was the School District that determined FCA was violating the Non-Discrimination Policy, the issue came to its attention as a result of Glasser's open hostility towards FCA's religious beliefs expressed to Principal Espiritu and the Climate Committee.[3]  The Climate

---

[2] The record is somewhat conflicting about whether the School District or Principal Espiritu had the final say on derecognition.  School District officials testified that "ASB approval [is] handled at the individual school level" by the school principal and that the School District only provides guidance around compliance with its policies and has never—and did not for FCA—mandate a specific action.  But Espiritu and School District officials also testified that the decision to derecognize FCA received sign-off from the School District and was applied district-wide.  Ultimately, there is little doubt that Pioneer was substantially involved in revoking FCA's recognition.

[3] The Non-Discrimination Policy was an afterthought to Pioneer officials.  Glasser never mentioned the Non-Discrimination Policy in his letter to Principal Espiritu.  And the Climate Committee determined that FCA's Statement of Faith "goes against core values of [Pioneer High School] (inclusive, open-mindedness)," not that it violated the Non-Discrimination Policy.  We acknowledge that the Climate Committee's

Committee's "united stance" then catalyzed the School District's derecognition of FCA.

The defendants also cannot dismiss their past animus by relying on the newly-adopted All-Comers Policy. When Pioneer officials pushed to have FCA derecognized after the Climate Committee meeting, the plaintiffs were deprived of ASB recognition in violation of their Free Exercise rights. FCA had enjoyed ASB recognition for nearly two decades without controversy, and the School District's laissez-faire attitude to enforcing its Non-Discrimination Policy meant that FCA would likely retain recognition but for the Climate Committee's actions. As Pioneer's Activities Director admitted, renewal of ASB recognition for already-established clubs like FCA was a formality.

The defendants say their concerted effort to derecognize FCA should be excused because ASB approval is decided annually, and during the upcoming 2022–23 school year, the only relevant inquiry is whether the School District may properly deny FCA recognition for violating its All-Comers Policy. But as explained in the majority opinion, the defendants concede that FCA will not be approved while it maintains its faith requirements for student leaders, and the All-Comers Policy is inextricably linked to the Non-Discrimination Policy in force in Spring 2019.

---

reference to inclusivity and open-mindedness could arguably be interpreted as an invocation of the District's Non-Discrimination Policy. But the selective enforcement demonstrates that noncompliance with the policy was a necessary but insufficient condition for derecognition. The record supports the inference that the added ingredient of hostility is what caused the Climate Committee to turn its legitimate concern for discrimination into action.

* * * * *

In sum, animus against the FCA students' religious-based views infected the School District's decision to strip the FCA of its ASB status. And that violates the First Amendment's protection of the free exercise of religion.

CHRISTEN, Circuit Judge, dissenting:

In their haste to reach the merits of this dispute, plaintiffs urge us to resolve fact-laden questions relevant only to their claims for past injuries, not to the prospective ones at the center of their motion for a preliminary injunction. They then insist that the district court's adherence to binding precedent constitutes an abuse of discretion. Our court responds by reaching the merits and adopting plaintiffs' version of disputed facts—before parsing whether plaintiffs established the "irreducible constitutional minimum" of Article III standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see also Sierra Club v. Morton*, 405 U.S. 727, 735 (1972); *Summers v. Earth Island Inst.*, 555 U.S. 488, 492–93 (2009). Because we lack jurisdiction, I respectfully dissent.

Rather than requiring declarations of the sort called for by *Lujan, Sierra Club*, and *Summers*, the court accepts counsel's unsupported assurances that a student intends to apply for ASB status for the 2022–23 school year. It also selectively reviews the record. First, the majority relies upon an FCA staff member's hearsay assertion that a student intended to apply for ASB recognition for the 2021–22 school year, overlooking that—for unknown reasons—this student did not apply that year and is no longer listed as a club member. Next, the majority pivots to a later declaration

by the same FCA staff member that addresses the right school year, 2022–23, but identifies a different student-club leader and fails to present even a second-hand account of the required intent.  In fact, the declaration says nothing at all about whether the newly identified student intends to apply for club recognition or would do so if the District's policy were enjoined.  Puzzlingly, the majority is persuaded by plaintiffs' argument that a pre-trial discovery stipulation prevents them from offering student statements or testimony.

The stipulation plaintiffs voluntarily entered into cannot excuse their failure to establish a justiciable controversy, and the unavoidable reality is that the District's nondiscrimination policy will not harm FCA if no student intends to apply for ASB recognition.  Both the Supreme Court and our Circuit have dismissed multiple claims for lack of standing where would-be litigants presented far more concrete and specific plans than the conclusory and unsupported declarations offered by plaintiffs.  If we are to apply the law evenly and fairly, we should dismiss this appeal.

I.

A.

The FCA is an international religious ministry with thousands of student chapters at United States educational institutions, including colleges, high schools, and middle schools.  These chapters are led by student leaders who must be approved by FCA National.  FCA adheres to a core set of Christian beliefs that are set forth in its "Statement of Faith." While all students are eligible to become members of FCA, student leaders of FCA must agree to abide by the beliefs

articulated in its Statement of Faith.  Among other things, the Statement of Faith provides:

> God's design for sexual intimacy is to be expressed only within the context of marriage. God instituted marriage between one man and one woman as the foundation of the family and the basic structure of human society.  For this reason, we believe that marriage is exclusively the union of one man and one woman.

Potential FCA leaders fill out student leadership applications, in which they "affirm their agreement with FCA's Christian beliefs" and pledge to "not subscribe to or promote any religious beliefs inconsistent with these beliefs."  FCA student leaders must also agree to adhere to the FCA's "Sexual Purity Statement."  It provides:

> God desires His children to lead pure lives of holiness.  The Bible teaches that the appropriate place for sexual expression is in the context of a marriage relationship.  The biblical description of marriage is one man and one woman in a lifelong commitment.
>
> While upholding God's standard of holiness, FCA strongly affirms God's love and redemptive power in the individual who chooses to follow Him.  FCA's desire is to encourage individuals to trust in Jesus and turn away from any impure lifestyle.

Starting in the early 2000s, students led FCA clubs on three campuses in the San Jose Unified School District,

including at Willow Glen, Leland, and Pioneer High School. Plaintiffs Charlotte Klarke and Elizabeth Sinclair, high school seniors, were student leaders of Pioneer FCA. FCA clubs were part of the District's program for recognized student-led organizations known as the Associated Student Body (ASB) program.

The ASB program provides a forum for clubs to organize around students' "personal interests"; to "give students practice in self-governance"; to "provide social and recreational activities"; and to "enhance school spirit and student sense of belonging." ASB clubs are student-led and only students may be members. ASB clubs receive several benefits, including access to an official faculty advisor, access to ASB accounts and bookkeeping services, inclusion in official school club lists (which apparently helps with recruitment), inclusion in the yearbook, priority access to campus meeting space, and the ability to conduct ASB-approved fundraisers on and off campus. No clubs receive ASB funding. Students must apply for renewal of ASB recognition each fall. The application must be signed by the group's student officers.

## B.

In April 2019, three Pioneer High School students complained about FCA's requirement that students seeking club leadership positions agree to abide by its Statement of Faith and Sexual Purity Statement. Pioneer High School Principal Herbert Espiritu contacted the District Superintendent's Office and it determined that because FCA National's leadership restrictions violate the District's nondiscrimination policies FCA clubs are therefore ineligible for ASB recognition.

The District's nondiscrimination policies (Board Policies 0410 and 5145.3, collectively, "the Policy"), both state that District programs, activities, and practices shall be free from discrimination based on, among other things, gender, gender identity and expression, race, color, religion, ancestry, national origin, immigration status, ethnic group, pregnancy, marital or parental status, physical or mental disability, sexual orientation or the perception of one or more of such characteristics.[1]

---

[1] Board Policy 0410 states:

> The Governing Board is committed to equal opportunity for all individuals in district programs and activities. District programs, and activities, and practices shall be free from discrimination based on gender, gender identity and expression, race, color, religion, ancestry, national origin, immigration status, ethnic group, pregnancy, marital or parental status, physical or mental disability, sexual orientation or the perception of one or more of such characteristics. The Board shall promote programs which ensure that any discriminatory practices are eliminated in all district activities.

Board Policy 5145.3 states:

> All district programs and activities within a school under the jurisdiction of the superintendent of the school district shall be free from discrimination, including harassment, with respect to the actual or perceived ethnic group, religion, gender, gender identity, gender expression, color, race, ancestry, national origin, and physical or mental disability, age or sexual orientation. The Governing Board desires to provide a safe school environment that allows all students equal access to District programs and activities regardless of actual or perceived ethnicity,

It is uncontested that in May 2019, Espiritu informed the Pioneer FCA's student leaders that Pioneer High School would no longer recognize the club as an ASB student group because the District's Policy did not permit the District to "sponsor programs or activities with discriminatory practices." But the parties argue at length about the events that followed FCA's derecognition, whether the District's reliance on its nondiscrimination policies to derecognize FCA was pretextual, and whether the actual decision was based on FCA's religious beliefs. Many facts concerning the parties' controversy remain unresolved, but most readers will be hard-pressed to know that from reading the majority's opinion. Regrettably, though this case is at the preliminary injunction stage, it may appear to readers that the court has adopted plaintiffs' version of events as established historical fact. To give just a few examples: the majority proclaims that there is "unrebutted evidence that the School District has exempted a secular group from its All-Comers Policy," but this is contrary to the district court's finding that plaintiffs did not establish that "any club [besides FCA] discriminates in violation of the Policy" or has "refused to sign the ASB Affirmation Form." The majority also asserts that "Girl Talk and Big Sisters/Little Sisters limited membership to female-identifying students." What the Pioneer Activities Director actually stated in her declaration was that "there is no indication" that Girl Talk "was approved by the ASB," and that she did "not recall that club ever being active" since 2015. As to Big Sisters/Little Sisters, the Director testified that the group "essentially acted as one club" with Big Brother/Little Brother—"the Big

---

religion, gender, gender identity, gender expression, color, race, ancestry, nation origin, physical or mental disability, sexual orientation, or any other classification protected by law.

Sib / Little Sib Club"—and that "[a]nyone can be a member or leader of either of the clubs." The majority contends that "the school's selective enforcement of the All-Comers Policy was apparent" because the Director stated in her deposition that Girls Who Code and Girls' Circle could limit their membership to female-identifying students. But the majority ignores the district court's findings to the contrary. In fact, the Girls Who Code club constitution does not restrict membership or leadership based on gender, the club's organization manager told the Associate Superintendent that "all interested students may participate" in the club, and the club was cofounded by a male student who "served as co-president." The Director also clarified that Girls' Circle is a separate Pioneer counseling program and is not a student club, is not ASB approved, and has no ASB account. Finally, the majority declares that a student identified as "N.M." has "stated an intention to apply for ASB recognition if an injunction is granted." In fact, neither N.M. nor any other student has declared an intent to apply for 2022–2023, the school year that matters for purposes of prospective injunctive relief. *See infra.*[2]

As an appellate court, it is not our role to find facts (we are "a court of review, not of first view," *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005)), and the trial court's findings at this preliminary stage are binding unless clearly erroneous, *see, e.g.*, *Landis v. Washington State Major League Baseball Stadium Pub. Facilities Dist.*, 11 F.4th

---

[2] The concurring opinion also claims that there "is no indication" that a Pioneer staff member's "inimical view of FCA was rebuffed." This disregards the testimony from the District's 30(b)(6) witness that Principal Espiritu "had a conversation" with the staff member in which the Principal "coached him on how to consider the way students might respond."

1101, 1105 (9th Cir. 2021).  It bears noting that this case has yet to go to trial and some of the statements relied upon by the majority have not even been stress-tested at deposition. In short, against the backdrop of a heated controversy in a public high school involving important and competing constitutional rights, the court misses an opportunity.  Our schools should be places where students learn how to interact with each other as citizens, *see Mahanoy Area Sch. Dist. v. B. L.*, 141 S. Ct. 2038, 2046 (2021), to resolve issues civilly, and to respect the judicial process.  Here, the court likely—and regrettably—adds fuel to the controversy at Pioneer High.

## C.

After the District derecognized FCA, it placed FCA's student groups into a new category, "student interest groups," which are permitted to advertise and meet at the school, participate in club rush, and use the auditorium. Student interest groups do not have access to an ASB account or bookkeeping, cannot raise funds on campus, and do not appear in the yearbook.  In the fall of 2019, FCA was denied ASB recognition for the 2019–20 school year.  In the Spring of 2020, the District created an "ASB Affirmation Form" that all ASB clubs must complete in order to receive ASB recognition.[3]  The parties refer to this form as the "All-Comers Policy."  *See Christian Legal Society v. Martinez*, 561 U.S. 661, 696 (2010) (expressly approving the use of an all-comers policy).  By signing this form, ASB club leaders

---

[3] Relevant here, the form states that no "ASB recognized students groups shall discriminate against any student or group of students or any other person on any unlawful basis, including on the basis of gender, gender identity and or expression, race, . . . religion, . . . [or] sexual orientation."

affirm that they will allow "any currently enrolled student to participate in, become a member of, and seek or hold leadership positions in the organization, regardless of his status or beliefs."

Student club activities stopped that Spring due to COVID-19 and clubs did not meet in person again until April 2021. For the 2020–21 school year, classes and school activities were conducted remotely, and Pioneer High School granted modified conditional approval to all student clubs, including Pioneer FCA, that year.

In anticipation of the 2021–22 school year, the District issued new guidelines, trained its directors on the ASB approval process, revised the ASB application, and created standardized application forms and club constitutions requiring all ASB-recognized clubs to abide by the District's nondiscrimination policy. All ASB-approved clubs in 2021–22 were required to sign the form agreeing to follow the District's Policy and to adopt constitutions prohibiting discrimination in club membership and leadership. No FCA club applied for recognition at any District high school for the 2021–22 school year, and Pioneer FCA declined an invitation to host a table at Pioneer High School's club rush that fall.

Plaintiffs FCA National and seniors Klarke and Sinclair filed the present lawsuit on April 22, 2020, before Pioneer High School provisionally recognized all student groups for the 2020–21 school year. Defendants moved to dismiss plaintiffs' complaint in August 2020, and the district court granted the motion in part. The court dismissed with prejudice Klarke's and Sinclair's claims for prospective injunctive relief because those claims became moot when Klarke and Sinclair graduated. Klarke's and Sinclair's damages claims remain pending. The district court

dismissed all of FCA National's claims without prejudice because it failed to allege its own organizational or associational standing. The district court also dismissed FCA's facial challenges to the Policy after concluding it was content neutral.

FCA National, Klarke, Sinclair, and Pioneer FCA filed the operative complaint in July 2021. A few weeks later, plaintiffs filed a motion for a preliminary injunction seeking an order requiring the District to recognize Pioneer FCA as an ASB student group. Though plaintiffs' complaint includes concerning allegations that one or more faculty members made disparaging comments directed at FCA, their motion for a preliminary injunction sought only an order directing the District to grant ASB recognition for FCA. Defendants again moved to dismiss. Their motion argued that FCA National and Pioneer FCA lacked organizational standing and that all plaintiffs lacked standing for the requested prospective injunctive relief.

While the motion to dismiss and motion for a preliminary injunction were pending, the parties completed discovery. In the process, the District agreed not to depose any current or former FCA-affiliated students and FCA stipulated that it would neither call any FCA-affiliated students or former students at trial, nor use "previously unsubmitted testimony or statements of such witnesses . . . at trial, at any hearing in this case, or in connection with any motion." The stipulation did not limit the introduction of testimony from plaintiffs Klarke and Sinclair.

The district court denied the motion for a preliminary injunction on June 1, 2022. This appeal is limited to that ruling.

II.

A.

The Supreme Court has said that Article III's standing requirement is the "irreducible constitutional minimum." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Thus, we must begin by establishing that we have jurisdiction to review the district court's order denying FCA's motion for a preliminary injunction. *See Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1405 (9th Cir. 1991)*.*  Because standing must be established "for each form of relief that is sought," *Davis v. FEC*, 554 U.S. 724, 734 (2008), it is not enough that FCA National, or Pioneer FCA, or any other plaintiff may have standing to bring claims for past violations of their constitutional rights.  To obtain the pre-trial prospective relief requested by the preliminary injunction, plaintiffs must establish that they will be harmed during the 2022–23 school year by the District's Policy, and *that* requires showing that a student intends to apply for ASB recognition, or would do so if the policy were enjoined.[4]

Our Constitution limits "the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  To satisfy Article III's standing requirements, either FCA National or Pioneer FCA must establish that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant,

---

[4] Klarke and Sinclair are not parties to this appeal because it is limited to reviewing the denial of plaintiffs' preliminary injunction motion and Klarke's and Sinclair's claims for prospective relief were dismissed with prejudice.

and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560–61; *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).

Claims for prospective relief implicate Article III's requirement that the articulated injury be "actual" or "imminent."[5]   The Supreme Court has held that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief" unless it is accompanied by "continuing, present adverse effects," *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (internal quotation marks omitted) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)); or the plaintiff demonstrates there is "sufficient likelihood that she will again be wronged in a similar way, *Villa v. Maricopa Cnty.*, 865 F.3d 1224, 1229 (9th Cir. 2017) (alteration omitted) (quoting *Lyons*, 461 U.S. at 111).

The majority persistently conflates plaintiffs' claims for past and future injury; this error runs through its opinion. For example, as the district court recognized, even if FCA were able to show that the District failed to enforce its Policy in the past, the procedures the District implemented in the spring of 2020 to require all ASB clubs adopt standardized constitutions and affirm their compliance with the Policy, were designed to ensure all clubs' compliance on a going-

---

[5] The Supreme Court has articulated this part of the test as "actual *and* imminent" and also as "actual *or* imminent." *See, e.g.*, *Summers*, 555 U.S. at 493 ("actual and imminent"); *Lujan*, 504 U.S. at 564 ("actual or imminent").   In *East Bay Sanctuary*, we cited the "actual *and* imminent" formulation of the injury-in-fact test.  993 F.3d at 663.  But in *Lujan*, the Supreme Court articulated the test as "actual *or* imminent," and recognized that where harm has not yet occurred, imminence must be shown. *See Lujan*, 504 U.S. at 565 n.2.

forward basis.   The majority insists that the nondiscrimination policy and the All-Comers Affirmation Form were "one and the same," but this is plainly wrong. The affirmation form serves a critically distinct function and it was central to the district court's determination that prospective injunctive relief was not warranted.

The majority accepts plaintiffs' argument that the District selectively enforced its Policy because the District approved the Senior Women Club's ambiguous ASB application, which simultaneously affirmed compliance with the Policy and included a notation that "[m]embers are considered students who are seniors who identify as female." The majority brushes off the district court's factual finding that "there is no clear proof that the district allows the club to violate the Policy," or that the club actually discriminates. The district court did not ignore the ambiguity presented by the handwritten notation but recognized the District's approval may have been an oversight. *See Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 804 (9th Cir. 2011) (finding no selective enforcement where a school "inadvertently" approved a discriminating student group due to "administrative oversight," or where, "despite the language in [its] application[]," the supposedly offending group "agreed to abide by the nondiscrimination policy"). The court's analysis demonstrates that it correctly limited its focus to how the Policy would operate prospectively.  The majority's scattershot references to other clubs are also unavailing because the court found no club besides FCA has refused to sign the ASB Affirmation Form and there is no evidence that any other club discriminates.  Critically, the court found District officials have no discretion to grant exemptions to the Policy. *Cf. Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1879 (2021).  The majority misunderstands the significance of the All-Comers Policy and incorrectly

relies on allegations of past selective enforcement to conclude that FCA faces an ongoing or imminent injury from the District's nondiscrimination policy.

## B.

The Supreme Court has "repeatedly reiterated" that threatened injury is not enough. *Clapper v. Amenesty Int'l USA*, 568 U.S. 398, 409 (2013). Instead, the plaintiff must establish a threatened injury that is "certainly impending" or that "there is a substantial risk the harm will occur." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 825 (9th Cir. 2020) (internal quotation marks omitted) (quoting *In re Zappos.com, Inc*, 888 F.3d 1020, 1024 (9th Cir. 2018)).

FCA bears the burden to establish each element of standing "with the manner and degree of evidence required" for this stage of the litigation. *Lujan*, 504 U.S. at 561. Even at the preliminary injunction stage, FCA must make a "clear showing" of each element of Article III standing. *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013).

Organizations can assert standing on behalf of their members or in their own right, *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 662 (9th Cir. 2021), and the operative complaint invokes both theories.[6]  To assert

---

[6] FCA National first argued that it has standing, as a national organization, to challenge policies forbidding the formation of student clubs on public school campuses, but it offered no authority for this proposition and we have never embraced such a capacious theory of organizational standing. *See E. Bay Sanctuary*, 993 F.3d at 662. Pioneer FCA separately argued that it has standing as the "object of" the District's actions. We have rejected the "broad" proposition that "the object of a regulation" is presumed to have standing. *Cal. Sea Urchin Comm'n v. Bean*, 883 F.3d 1173, 1181 (9th Cir. 2018).

standing on behalf of its members, the FCA plaintiffs must establish that at least one of its members would have standing to sue, that the interests the suit seeks to vindicate are germane to the organization's purpose, and that neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).[7]  In their representational capacity, FCA National and Pioneer FCA allege that student members have standing to obtain prospective injunctive relief because they face imminent injury from the District's nondiscrimination policy for the 2022–23 school year and the Policy deters them from applying for ASB recognition for the 2022–23 school year.

To assert direct standing on its own behalf, FCA must "allege[s] such a personal stake in the outcome of the controversy as to warrant [its] invocation of federal-court jurisdiction[.]"  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (citation and internal quotation marks omitted).  This requires showing "the defendant's behavior has frustrated [the organization's] mission and caused it to divert resources in response to that frustration of purpose." *E. Bay Sanctuary*, 993 F.3d at 663 (citing *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)).  FCA National and Pioneer FCA allege the District's denial of ASB recognition will discourage students from starting, maintaining, or participating in FCA clubs and thus frustrate

---

[7] *Sabra v. Maricopa County Community College District*, on which the majority relies, is not to the contrary.  *See* No. 20-16774, 2022 WL 3222451 (9th Cir. Aug. 10, 2022).  That case did not involve a request for preliminary injunctive relief and we concluded only that the organization's "broadly alleged" diversion-of-resources injury was sufficient to establish that the organization had been harmed in the past. *Id.* at *8.

FCA's mission.   FCA National alleges that it diverted resources in response to the District's decision to derecognize FCA in 2019, devoted additional staff member time to Pioneer FCA members, and paid attorneys to educate District officials and FCA members about rights available under the Equal Access Act and the First Amendment.  FCA contends that these harms are "ongoing," but the *prospective* harm the motion for a preliminary injunction is premised upon is the risk that FCA will not be recognized during the 2022–23 school year.  The district court correctly reasoned that harm resulting from the District's decision to derecognize the club during the 2019–20 and 2021–22 school years cannot be redressed by an order requiring recognition for 2022–23.  Plaintiffs' claims for damages arising from past harms will be litigated when this case proceeds to trial.

### C.

It is uncontested that student groups like FCA must reapply each fall for official ASB recognition.  It is also uncontested that only student club leaders may apply.  Because the District's nondiscrimination policy cannot cause a real or immediately impending injury to FCA if no students apply for ASB recognition, FCA cannot establish standing without evidence that a Pioneer FCA student has applied, or intends to apply, for ASB recognition for the upcoming school year. FCA failed to make that showing.  Plaintiffs thus lack standing to seek prospective preliminary relief, and our court lacks jurisdiction over this preliminary injunction appeal.

### 1.

In *Sierra Club v. Morton*, the Supreme Court ruled that an organizational plaintiff lacked standing because it "failed

to allege that it or its members would be affected in any of their activities" by the Forest Service's approval of a construction project in Sequoia National Park. 405 U.S. 727, 735 (1972). The Court explained that Article III requires "more than an injury to a cognizable interest[;] [i]t requires that the party seeking review be himself among the injured." *Id.* In *Morton*, because the anticipated effects of the proposed construction would "be felt directly *only* by those who use" the Park, the Sierra Club was required establish that its members use (or intended to use) the Park in a way that could be significantly affected by the Forest Service's action. *Id.* (emphasis added). The Sierra Club failed to establish Article III standing because it did not show, in any of its "pleadings or affidavits," that its members would be affected by the Forest Service's actions. *Id.*

The Supreme Court expanded on these principles in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992). There, the Court held that an environmental organization lacked standing to challenge a regulation jointly promulgated by the Secretaries of Interior and Commerce affecting endangered species in foreign countries. *Id.* at 558, 564. The Court concluded that Defenders of Wildlife also failed to show that its members suffered an "actual or imminent injury" from the Secretaries' regulation. *Id.* at 564. Unlike in *Morton*, the Defenders of Wildlife provided affidavits from its members stating that they previously visited the countries where the endangered species were located and that the members intended to visit again. *Id.* at 563–64. One member of the Defenders stated that she had traveled to Egypt a few years prior, had "observed the traditional habitat of the endangered [N]ile crocodile there and intend[s] to do so again, and hope[s] to observe the crocodile directly." *Id.* at 563. She stated that she would "suffer harm in fact as the result of [the] American . . . role

. . . in overseeing the rehabilitation of the Aswan High Dam on the Nile . . . and [in] develop[ing] . . . Egypt's . . . Master Water Plan." *Id.* Another member stated that she had traveled to Sri Lanka in 1981, observed the habitat of endangered species like the Asian elephant and leopard at what had become the site of a development project, and that the threat from the development project harmed her because she "intend[ed] to return to Sri Lanka in the future." *Id.*

Despite these affidavits, the Supreme Court dismissed the Defenders' complaint for lack of standing. *Id.* at 578. Specifically, the Court concluded that the affidavits were insufficient to demonstrate an imminent injury to the group's members. *Id.* at 564. That one member had visited the areas of the projects before the projects commenced "prove[d] nothing" because allegations of a cognizable injury are not enough to establish standing for prospective relief. *Id.* The Court explained that the members' statements of intent to return to the locations affected by the regulation were "simply not enough," because "[s]uch 'some day' intentions —without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Id.*

The Supreme Court reached the same result in *Summers v. Earth Island Institute*, concluding that an environmental organization lacked standing to challenge the Forest Service's enforcement of regulations exempting projects from the Forest Service's appeal process. 555 U.S. 488, 490 (2009). As in *Lujan*, the Supreme Court rejected an affidavit submitted by a member of the organization and concluded that it was insufficient to show an imminent injury. The member's affidavit in *Summers* asserted that he had "suffered injury in the past from development on Forest

Service land." *Id.* The Supreme Court reasoned that this statement was insufficient because the injury was not tied to the challenged regulations, the affidavit did not identify a specific site in the forest, and it related only to past injury, not any imminent future injury justifying prospective injunctive relief. *Id.* The Court also rejected the member's statement that he had visited unnamed national forests in the past and planned to visit national forests in the future, concluding that these allegations were insufficient because it was impossible to tell which forests the member might visit, and accordingly, which projects the organization might have standing to challenge. *Id.* Finally, though the member also specifically stated that he wanted to visit locations in Allegheny National Forest, his statement lacked any "firm intention" to visit these locations and thus was "insufficient to satisfy the requirement of imminent injury." *Id.* at 496.

The Court's insistence upon a showing of imminent future injury to justify prospective injunctive relief has not been limited to the environmental context. In *Adarand Constructors, Inc. v. Pena*, a construction company brought suit because its efforts to compete for highway construction contracts were frustrated by the federal government's use of contractual clauses that allegedly prevented it from "competing on equal footing" with similarly situated businesses. 515 U.S. 200, 211 (1995). Because the company's standing to bring suit depended on the existence of future contracts that did not yet exist, the Court analyzed whether the company "made an adequate showing that sometime in the relatively near future *it will bid* on another Government contract" likely to contain the challenged clause. *Id.* (emphasis added). The Supreme Court concluded that the company had established standing because it provided deposition testimony from its general manager that it bid on "*every* guardrail project" in Colorado,

and it showed that each year, there were an average of 1.5 guardrail contracts in Colorado that incorporated the clause. *Id.* at 212 (emphasis added). On this showing, the company's injury was sufficiently imminent and it was deemed to have standing to pursue prospective relief.

Following the Supreme Court's lead, we have insisted upon "concrete plans" or "firm intentions" as an indispensable part of Article III's imminence analysis. For example, we have held that environmental plaintiffs did not face imminent injury from a challenged environmental regulation unless they establish concrete plans or firm intentions to visit or use the locations that will be affected by the challenged regulation. *See, e.g.*, *Wilderness Soc., Inc. v. Rey*, 622 F.3d 1251, 1256 (9th Cir. 2010) (rejecting as insufficient an affidavit demonstrating the organizational plaintiff's member's "extensive past use" of the affected location because the member's expressed intent to return was indefinite and akin to a "some day" intention). In the Americans with Disabilities Act context, we have explained that an individual with disabilities faces imminent injury from a non-accommodating business only if the plaintiff demonstrates her intent to return to the business if it is made accessible. *See, e.g.*, *D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1038–39 & n.9 (9th Cir. 2008).

Similarly, in *Yazzie v. Hobbs*, we dismissed an appeal from the denial of a preliminary injunction arising from a vote-by-mail deadline. 977 F.3d 964, 967 (9th Cir. 2020) (per curiam). There, plaintiffs argued that the myriad challenges faced by the Navajo Nation—the need to travel to a post office, socioeconomic challenges, language barriers, and the extended delays before mail ballots from the Navajo nation are received—diminished their opportunity to vote. *Id.* at 965–66. Rather than jumping to

the merits of plaintiffs' compelling allegations, we held that they lacked standing for failure to show risk of imminent injury because they did not establish they intended to vote by mail in the upcoming election. *Id.* We concluded plaintiffs' general intent to, "at some point," cast ballots in a particular way was the "epitom[e]" of speculative injury. *Id.* at 966.

These constitutional minimums for standing come into sharp focus when plaintiffs challenge threats of future government action. For example, in *Lopez v. Candaele*, a student enrolled in "Speech 101" at Los Angeles Community College decided to give his assigned speech on his belief in God, including a "dictionary definition of marriage as being a union between a man and a woman." 630 F.3d 775, 782–83 (9th Cir. 2010). After the speech, the instructor called Lopez a "fascist bastard." *Id.* at 783. The student then submitted a proposed speech about how one should "always stand up for what you believe in." *Id.* It was returned with an "A" grade and a note from the instructor on the proposed topic: "Remember—you agree to Student Code of Conduct as a student at LACC." *Id.* After obtaining counsel, Lopez moved to preliminarily enjoin the college from enforcing its sexual harassment policy against him. *Id.* at 782. To prove his intent to violate that policy, Lopez offered his plan to "discuss his Christian views on politics, morality, social issues, religion, and the like." *Id.* at 790. We held that Lopez lacked standing to obtain preliminary injunctive relief, as the "few details" he provided were insufficient to make a clear showing that Lopez "faced a specific, credible threat of adverse state action" by the college. *Id.* at 788. In part, we based our conclusion on the fact that Lopez failed to "adequately prove[] his intent to violate the policy" with speech that arguably fell within the policy's scope. *Id.* at 790.

Similarly, we have held that a plaintiff who lacks concrete plans or firm intentions to violate a challenged criminal statute or nondiscrimination law does not face imminent injury that is sufficient to challenge the law before its application. *See San Diego Cnty. Gun Rts. Comm. v. Reno*, 98 F.3d 1121, 1126–27 (9th Cir. 1996) (rejecting plaintiffs' alleged "wish and intent to engage in activities prohibited by" a challenged statute as too indefinite); *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1141 (9th Cir. 2000) (dismissing complaint, on Article III justiciability grounds, where landlords expressed their intent to violate an anti-discrimination law by refusing to rent to unmarried couples on religious grounds, because plaintiffs failed to allege when, where, or under what circumstances they had or would violate the anti-discrimination law.)  The absence of a concrete plan or firm intentions to take action that will trigger the challenged conduct renders any future injury too speculative for Article III purposes. *Thomas*, 220 F.3d at 1139; *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1407 (9th Cir. 1991).

The FCA plaintiffs' suggestion that they are entitled to prospective injunctive relief without showing that FCA student members have sufficiently definite plans to apply for ASB recognition for the 2022–23 school year, or that they would apply in the absence of the District's nondiscrimination policy, is flatly refuted by precedent. Under binding case law, FCA cannot assert standing on behalf of its members unless one member faces an imminent injury. Similarly, the FCA organizational plaintiffs must show that the District's Policy will affect them in order to establish standing on their own behalf. *Morton*, 405 U.S. at 735.  Plaintiffs cannot meet this burden because the District's nondiscrimination policy will not affect FCA's

ASB recognition if no student intends to apply for the 2022–23 year.

## 2.

FCA has not—and the majority ironically contends that FCA cannot—identify an FCA club member who intends to apply for ASB recognition during the upcoming 2022–23 school year.  This is so even though this case has been pending for two years, the motion for a preliminary injunction has been pending for more than a year, and discovery has been completed.  The only evidence in the record suggesting that FCA members intend to apply for ASB recognition comes from declarations and deposition testimony of FCA National employee Rigoberto Lopez.

First, Lopez's declarations are hearsay. The majority applies the general rule that a district court may consider hearsay in deciding whether to issue a preliminary injunction.  *See, e.g.*, *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (en banc).  The urgency of obtaining a preliminary injunction sometimes "necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial."  *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984).  But a court faced with a request for a preliminary injunction may give inadmissible hearsay only the weight to which it is entitled, and only when doing so "serves the purpose of preventing irreparable harm before trial."  *Id.*; *see Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (rejecting affidavits submitted in support of a motion for a preliminary injunction because the affidavits were "conclusory and without sufficient support in facts").  As one of our sister circuits has explained, the inquiry at the preliminary injunction stage is not whether the parties' proffered

evidence is classified as hearsay, "but whether, weighing all the attendant factors, including the need for expedition, this type of evidence was appropriate given the character and objectives of the injunctive proceeding." *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986).  No such urgency is present here.  Prior to the parties' joint stipulation regarding student testimony, FCA had seven months to support its request for a preliminary injunction with declarations from its student members.  It did not do so.

Nor does the majority question the veracity of Lopez's declarations when there are ample reasons to discount them. The declarations the majority relies upon are dated September 20, 2021, and May 20, 2022**.**  When Lopez was deposed in February 2022, he walked back the statements in his prior declarations.  The record does not show that the District has had an opportunity to depose Lopez after his most recent May 2022 declaration.  Despite concessions Lopez made in a subsequent deposition that undercut his declarations, the majority gives the declarations full weight. Although we may consider hearsay at the preliminary injunction stage, FCA must make a "clear showing" of imminent injury.  Lopez's declarations plainly do not satisfy that threshold.

My colleagues' suggestions to the contrary ring hollow. The majority contends that the District cannot fault FCA for "failing to submit evidence which they agreed not to require."  As a matter of law, plaintiffs cannot have waived jurisdiction.  And factually, the text of the parties' pre-trial stipulation clearly states that the District made "no admissions, explicit or implied, about what evidence is necessary, relevant, or admissible in this case."  The majority's only support for the notion that the stipulation was necessary to prevent FCA members from being

intimidated comes from counsel, not from students. Plaintiffs' counsel's bare assertions that student depositions "would likely result in the further intimidation of Pioneer FCA," and that "FCA-affiliated students are intimidated by depositions," are merely speculation.

Even giving some weight to Lopez's declarations and deposition testimony, Pioneer FCA does not come close to demonstrating concrete plans or firm intentions to apply for ASB recognition for the 2022–23 school year. Lopez's July 23, 2021 declaration was filed in anticipation of the 2021–22 school year and it stated that "District students are interested in leading and participating in FCA clubs, and in having an ASB-approved, FCA-affiliated student club." It did not identify a club member who was ready to apply. Lopez's second declaration was prepared shortly after the 2021–22 school year commenced and was dated September 20, 2021. This declaration identified M.H., a Pioneer freshman and student leader of Pioneer FCA during the 2021–22 school year. Lopez asserted that M.H. "want[ed] to apply for ASB recognition at Pioneer" for 2021–22, but that M.H. did not complete the District's application in light of the District's requirement that each applicant affirm adherence to the District's nondiscrimination policy. Lopez's declaration suggested that M.H. and other Pioneer FCA leaders, including student N.M., "indicated that they are intimidated by Defendants' actions" and "[i]f the Court grants an injunction allowing Pioneer FCA to have equal access to ASB recognition without having to give up its religious leadership standards, Pioneer FCA's leadership will apply for ASB recognition." But when asked at his deposition whether it was M.H. or Lopez who raised concerns about the District's nondiscrimination requirements, he conceded that these were "concerns, probably from what I recall, coming more from me." Also

during the deposition, the District asked Lopez about the statement from former Pioneer FCA leader L.W.—who graduated in June 2021—that future leadership would apply for ASB recognition for the 2021–22 year.  Lopez responded: "I mean, that's been their plan as student leaders since the club has been de-recognized."  Nothing more than this general assertion appears in the record.

Finally, Lopez's May 2022 declaration states that N.M. and another student (B.C.) are the leaders for the 2022–23 school year.  M.H. is not mentioned as a current club member or leader, and this most recent declaration says nothing at all about whether N.M. intends to apply for ASB recognition for the upcoming 2022–23 school year.

At best, Lopez's declarations are based on his understanding of another person's intentions, they are neither detailed nor specific, and, contrary to the majority's opinion, they make no representations about whether FCA's current student club leaders intend to apply for ASB recognition for the 2022–23 school year.  This is dispositive because the motion for a preliminary injunction sought only prospective injunctive relief.  Lopez's statements do not say "when, . . . where, or under what circumstances" the leaders of Pioneer FCA will apply for ASB recognition, *Thomas*, 220 F.3d at 1139, and Lopez provides even less information than the "some day" intentions that the Court deemed insufficient in *Lujan*, 504 U.S. at 564.  The only club leader Lopez identifies as having expressed an intent to apply is M.H., but the record reflects that she expressed the intent to do so last year, and didn't.  The record does not tell us why she decided against applying last year (Lopez admitted that the concerns raised in his conversation with M.H. about the District's Policy were "coming more from me"), and M.H. is not listed as a club member for the 2022–23 school year.

The majority suggests that this dissent focuses solely on Lopez's most recent declaration, and the majority purports to "know N.M. wants to apply for recognition." Neither statement is correct. Even cobbled together, Lopez's conclusory statements fall woefully short. *Cf. Lujan*, 504 U.S. at 564, *Rey*, 622 F.3d at 1256 (rejecting affidavit with documented "extensive" use). None of the declarations identify a student who has expressed an intent to apply for ASB recognition in 2022–23.

Without a showing that at least one student is ready to apply, plaintiffs' repeated assertions merely speculate that one or more FCA members "will be adversely affected by a defendant's action." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015); *see Lujan*, 504 U.S. at 563 (concluding no standing existed when the organization failed to "submit affidavits . . . showing, through specific facts . . . that one or more of [its] members would . . . be 'directly' affected" by the allegedly illegal activity). It is plaintiffs' burden to make a "clear showing" of Article III standing. They have not done so here.

3.

FCA and the majority next suggest that FCA need not identify a student member who intends to apply for ASB recognition because FCA is suffering ongoing harm. They are mistaken.

A plaintiff seeking prospective relief for ongoing government harm cannot rely solely upon his speculative fear of "imminent" government action as a present, ongoing injury. *See, e.g., Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015). To be sure, a deterrent, or "chilling" effect, on First Amendment rights can constitute a cognizable injury, but the chilling cannot be "based on a fear of future injury

that itself [is] too speculative to confer standing." *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020) (citation omitted) (alteration in original).  In *Laird v. Tatum*, the Supreme Court found that plaintiffs lacked standing to challenge the Army's alleged "surveillance of lawful and peaceful civilian political activity" because the plaintiffs did not provide any evidence that they were placed under illegal surveillance.  408 U.S. 1, 2, 9 (1972).  The Court rejected affidavits from the *Laird* plaintiffs stating that their First Amendment rights were being "chilled by the mere existence" of the challenged activity because "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."  *Id.* at 13–14.  To rely on allegations of "chill," a plaintiff bringing a First Amendment challenge to future government action must demonstrate his "intention to engage" in conduct proscribed by the government's rule and "credible threat" of adverse government action."  *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (alterations in original) (citation omitted).

FCA alleges, and the majority agrees, that the District's prior actions and hostility frustrated FCA's mission and required it to expend resources in the form of staff time and the cost of legal counsel.  The operative complaint includes allegations of past harm that, if proven, likely state a cognizable claim for "compensable injury."   But the majority misses that the remedy for past compensable injury is damages; a special showing is required prospective injunctive relief, *see Lyons*, 461 U.S. at 105, and this relief is requested pre-trial.  The Supreme Court has repeatedly emphasized that "'history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider,'" *TransUnion LLC v. Ramirez*, 141 S. Ct.

2190, 2204 (2021) (quoting *Sprint Communications Co. v. APCC Servs., Inc.*, 554 U.S. 269, 274 (2008)), and the majority points to no history or tradition that would warrant a pre-trial award of prospective injunctive relief in the circumstances of this case, because: (1) the District instituted practices to ensure compliance with its nondiscrimination policy on a going-forward basis, (2) the district court found no evidence that other clubs are discriminating, (3) the court found FCA was the only club that failed to affirm compliance with the nondiscrimination policy, and (4) the District retains no discretion to make exceptions to the Policy.

The requested injunction only requires the District to prospectively recognize FCA's student groups; in other words, plaintiffs seek an order granting FCA a reprieve from the District's nondiscrimination policy.  To the extent FCA's mission will be frustrated by the denial of ASB recognition in the upcoming school year, plaintiffs allege a *future* injury, not an ongoing one, because students must apply for ASB recognition each school year.  As explained in detail, this record does not establish that FCA's members will apply for recognition.  In keeping with binding precedent, we should hold that FCA's theory of direct organizational standing is impermissibly speculative.

FCA's argument that its members face ongoing injury is similarly defective.  Lopez's conclusory declarations assert that FCA members are intimidated and fearful of applying for ASB recognition "without a change" in the District's Policy, but that assertion did not hold up under cross-examination.  FCA pivots to argue that its members will be harmed by FCA's prior derecognition, and that an injunction requiring the District to recognize its student club would redress that past injury.  But that theory fails both for lack of

factual support showing intent to apply or intimidation, and for lack of legal support.  *See Lopez*, 630 F.3d at 785 (explaining that a plaintiff bringing a First Amendment pre-enforcement challenge to a government rule cannot show that his rights are currently "chilled" unless he demonstrates his intent to violate the government's rule).  Because FCA does not establish that any FCA member intends to apply for ASB recognition, its argument that FCA members face present and ongoing injury is based on speculative future harm and is insufficient to confer Article III standing to pursue prospective injunctive relief.

D.

My colleagues are correct that the competing values at issue in this case are cherished by our nation and enshrined in our Constitution.  The plaintiffs will surely have their day in court for their claims of past harm.  Once they do, the court will have to consider both the plaintiffs' rights and the rights of those they would exclude.  Notably, the majority offers no limiting principle to the permission it grants allowing one club to discriminate.  In the meantime, we are not free to contort our standing jurisprudence in order to prematurely reach the merits and we ought not do so in a case of this magnitude before the record has been developed and tested.

Discovery in this case is closed, and FCA's proof of standing comes entirely from the operative complaint and Lopez's statements, which are conclusory and not based on his personal knowledge.  No student has been identified who either intends to apply for ASB recognition or would apply in the absence of the District's Policy, and the parties' stipulation forecloses any student testimony of this kind.  There are many reasons the students may have decided not to apply last year and have not declared an intent to apply

this year.  With no statement from the students, the district court was left to guess.

In light of the posture of this case, controlling precedent requires that we dismiss FCA's appeal for lack of Article III standing.

For these reasons, I respectfully dissent.